[No. G026722. Fourth Dist., Div. Three. Mar. 9, 2001.]

ROBIN R. WILSON, Plaintiff and Appellant, v.
MICHAEL C. SHEA, Defendant and Respondent.

**COUNSEL**

Michelle R. McCall-Pena for Plaintiff and Appellant.

Merritt L. McKeon for Defendant and Respondent.

**OPINION**

**SILLS, P. J.**—Robin R. Wilson, a nurse, and Michael C. Shea, a deputy sheriff, had a child, Amanda, in 1990. Robin, however, did not bring this

paternity action until June 1998, and the instant appeal arises from a move-away and child support order signed and filed in December 1999. The order was the result of Robin's relocation to South Carolina to be with her mother.

Even though the trial judge granted the move-away order, the dominant theme of the hearing was the systematic poisoning of Michael's relationship with his daughter by Robin. Robin would not allow Michael to take Amanda to see his family, and had even gone so far as to tell Amanda when she was not yet five years old that Michael's wife was a witch. He was not allowed to stay on Amanda's fifth birthday (Amanda pleaded, "Daddy, don't go. Don't go, please.") and after that, Robin told him, "Why don't you just leave. I don't want nothing to do with you. I don't want your money. I don't want you to have nothing to do with Amanda." In the wake of the episode Michael didn't see his daughter for three years. Finally, when the case was filed and initially referred to mediation, Amanda was "petrified" of seeing her father; after a few visits, however, the counselor noted that Michael was "great" with his daughter and recommended visitation.

During his three years of exclusion from Amanda's life Michael voluntarily paid $300 a month to support Amanda. (Robin nonetheless told Amanda that her father hadn't "paid any money or anything in three years.") Michael continued with the $300-a-month payment until the court made a formal child support order at the time Robin brought this action: $650 a month, based on a DissoMaster (i.e., Fam. Code, § 4055 guideline) calculation. By the next summer, when the case came to trial, Robin had decided to relocate to South Carolina, though that meant a drop in her nominal income (from $55,000 to about $34,000 a year). The trial court entered a judgment based on the *previous* DissoMaster calculation ($650 a month) rather than recalculate the guideline child support under section 4055 of the Family Code.[1]

The court's judgment provided for Michael to travel to South Carolina "once about every three months (preferably on weekends)" for "day trips" to see Amanda, plus one week of summer visitation during which Amanda would travel to Southern California. The trial judge was adamant that the relationship between father and daughter be healed. Speaking to Robin, the court said, "For the benefit of your daughter, whatever we can do to keep Mr. Shea in her life as her father is going to benefit her later on when she grows up so we have to do that." Accordingly, the court ordered that $150 of the $650 was to be deducted from the amount Michael was to pay Robin, and put into a travel fund controlled by Michael. "Father needs to make some plan to travel back to South Carolina about every three months. We're

---

[1] All statutory references are to the Family Code unless otherwise specifically noted.

going to make an adjustment in the child support to make sure there is enough money that he can."

Robin had testified that a ticket to South Carolina costs in the "ballpark" of "$480, $500 round trip," so the $150 provided enough money for three or four visits per year. ($150 × 12 = $1,800, divided by $480 = 3.75 visits per year.) The net effect of the order was that Michael's monthly wages would only be garnished $500, instead of $650.

In a motion to vacate the judgment heard before the formal order was signed,[2] Robin argued, among other things, that the judge had not properly articulated findings in support of $150 to be subtracted from the guideline amount. The judge responded: "The findings are not obvious? Mother had basically alienated the relationship between father and daughter." The point of the deduction, the judge explained, was to attempt "everything we could to keep father involved in this child's life."

Robin has now appealed, making these contentions:

(1) The judge was obligated to recalculate child support using the guidelines (in practical terms, to rework the DissoMaster);

(2) The judge did not properly explain his reasons for deviating from them, as he was otherwise required to do; and

(3) The judge erred by allowing Michael to deduct $150 a month from the child support amount for travel.

*There Is No Exit from Calculating the Guideline Amount*

█ As to the first contention, Robin is undoubtedly right. While this court has expressed its sympathy for trial judges who are forced, by the statutory language of section 4050 et seq.,[3] to calculate a guideline amount for child support, the grisly math must still be done. There is simply nothing appellate courts can do to ease the trial courts' burden in this regard. (*In re Marriage of Hall* (2000) 81 Cal.App.4th 313, 316-317 [96 Cal.Rptr.2d 772] ["no trial judge making a child support order can escape making a formula calculation pursuant to section 4055"].)

In the motion to vacate the judgment, the trial judge gave two reasons for not recalculating the guideline amount. First, there was some uncertainty

---

[2]At the time the motion to "vacate the judgment" was filed, there was in fact no judgment (i.e., no signed order after hearing), only a minute order.

[3]Particularly section 4056, subdivision (a)(1), which requires the court to state the amount of support that would have been ordered under the guideline formula *before* it can make an order differing from the guideline formula.

about exactly how much Robin would be making when she arrived in South Carolina. While it is true that Robin jumped around a bit in her testimony about what she anticipated she would be earning, she nonetheless testified that she had been offered a job for around $34,000 per year and that she was applying for another job in roughly the same salary range. Under such circumstances, the amount of Robin's income was sufficiently ascertainable to make a guideline recalculation.[4]

The other reason for not recalculating the guideline amount was the difficulty in determining the time-share variable in the formula equation. Again, however, the record was sufficient to allow the trial court to make the calculation. The court established in its own visitation order the precise amount of time Michael would have with his daughter: One week and an additional four weekends per year. Assuming three-day weekends, that roughly computes to about three weeks out of the year, or about 5 percent, which is certainly a usable figure.

The failure to make a guideline calculation meant that the requirement of section 4056 subdivision (a)(1) (court must state the amount child support would have been under guideline formula) was not complied with. Therefore the judgment must be reversed.

Our decision is without prejudice to either party on two closely related issues likely to arise on remand. The first is whether Robin's reduced living expenses in the wake of her relocation to a part of the country that is generally acknowledged as much cheaper to live in than Southern California (cf. § 4053, subd. (l) [noting that the purpose of the guidelines is, among other things, to reflect *California's* higher costs of raising children than those found in other states]) might be a special circumstance justifying reduction in the guideline amount. The second is whether, under subdivision (b) of section 4058 ("The court may, in its discretion, consider the earning capacity of a parent in lieu of the parent's income, consistent with the best interests of the children."), income should be imputed to Robin because of the dramatic drop in her nominal income due to her relocation, consistent with Amanda's best interest. (Cf. Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2000) ¶ 6:443.5, p. 6-185 ["The fact that a parent is not working up to his or her earning potential because the parent is the *primary caregiver* for the children does not automatically create an exemption from Fam. C. § 4058(b) income imputation."].) Because of the nature of the trial court's order refusing to recalculate the guideline amount, there was no reason for these issues to be litigated the first time.

---

[4] We are spared the problem of what happens when one or the other of the parents has a genuinely nonascertainable income.

However, we cannot avoid the substance of Robin's two other contentions, both of which are fully briefed in this proceeding, because the case must now be sent back for what is, in essence, a new trial. (See Code Civ. Proc., § 43 ["if a new trial be granted, the court shall pass upon and determine all the questions of law involved in the case, presented upon such appeal, and necessary to the final determination of the case"].)

*The Need to Assure Frequent and Continuing Contact with the Noncustodial Parent May Justify Reducing the Guideline Amount to Provide for Necessary Travel Expenses*

■ As to the articulation issue, subdivision (a)(2) of section 4056 requires that the "reasons" for departing from the guideline be stated on the record; subdivision (a)(3) requires that there also be a justification for the departure based on the "best interests of the children." Here, the trial judge's reasoning for varying the guideline amount is, as the court itself noted, obvious. The father-daughter relationship was in desperate need of repair, and the only practical tool at hand was to have as much visitation as possible, even though that meant frequent transcontinental travel by parties of limited means.

The Legislature has declared that "it is the public policy of this state to assure minor children frequent and continuing contact with both parents after the parents have separated . . . ." (§ 3020.) Further, the California Supreme Court has noted that the law gives "broad discretion" to trial courts to modify visitation orders to minimize loss of the noncustodial parent's contact with a child in move-away cases, including "allocating transportation expenses to the custodial parent." (*In re Marriage of Burgess* (1996) 13 Cal.4th 25, 40 [51 Cal.Rptr.2d 444, 913 P.2d 473].) In the light of these policies, it is beyond peradventure that the need to assure the noncustodial parent "frequent and continuing contact" by varying the guideline amount to provide funds for such visitation and contact satisfies subdivision (a)(2) and (3) of section 4056.

There is language which in *In re Marriage of Gigliotti* (1995) 33 Cal.App.4th 518, 527 [39 Cal.Rptr.2d 367], might be taken for a hard and fast rule that provision of money for visitation would be insufficient to justify departing from the guidelines.[5] The language should not be so taken; the *Gigliotti* court limited its comment to the specific case before it. (See

---

[5]The *Gigliotti* court began by noting that the trial judge had made no findings at all that any factor, whether specified in the statutes or not, justified departing from the guideline amount. It then turned its attention to a "suggestion" in the supporting parent's brief that "because it was [the supported parent] who moved away with [the child], it is just and appropriate to

*ibid.* ["we perceive no equity or logic in such a result *in this case*" (italics added)].)

Justice King has eloquently pointed out how, in "many circumstances" the "inflexibility of the child support statutes is creating havoc and undue hardship." (*In re Marriage of Fini* (1994) 26 Cal.App.4th 1033, 1042, fn. 10 [31 Cal.Rptr.2d 749].) There is nothing we or any other panel of the appellate court can do to relieve the burden those statutes place on family court trial judges to run the DissoMaster or some equivalent to calculate a guideline, but we certainly can refrain from enunciating common law rules that make an inflexible system even more inflexible.[6]

With all respect to the *Gigliotti* court, it is perhaps not too much to say that one can indeed perceive times when "equity or logic" *would* justify lowering child support so as to facilitate visitation in the wake of a move-away. Frequent and continuing contact between a child and the noncustodial parent is good in itself. (See § 3020.) Frequent and continuing contact is good because it facilitates overall involvement by the noncustodial parent in a child's life and that is good for the child. (See Adams, *Child Custody and Parental Relocations: Loving Your Children From a Distance* (1994) 33 Duq. L.Rev. 143, 153 [noting one study that concluded that "frequent access to the noncustodial parent" gave the children in the study "a sense of control and helped to alleviate the negative feelings of helplessness and low self-esteem from which they suffered after the divorce"] (hereinafter Adams, *Loving Your Children From a Distance*).) And it is good because both commonsense and empirical data would indicate it increases the likelihood of actual payment of the support itself. (See Pearson & Thoennes, *Supporting Children After Divorce: The Influence of Custody on Support Levels and*

---

reduce [the supported child's] level of child support because of [the supporting parent's] increased costs in connection with visitation, regardless of the parties' incomes." The court dismissed the suggestion in the brief with these two sentences: "By this logic, the child's level of support with the primary custodial parent is being reduced for no other reason than the fact that, with the court's permission and implied finding that such move was in the child's best interest, the child's primary residence was moved a substantial distance from [the supporting parent's] residence. [The supporting parent] cites no provision in the Family Code which permits a reduction in child support for that reason alone, and we perceive no equity or logic in such a result in this case." (*In re Marriage of Gigliotti, supra*, 33 Cal.App.4th at p. 527.)

[6]Flexibility now is particularly important given that move-aways by custodial parents are more likely, in the wake of *In re Marriage of Burgess, supra*, 13 Cal.4th 25, 32 (burden on noncustodial parent to show that move is prejudicial to minors). In an out-of-nation move-away case where the trial court established a " 'travel-trust fund,' " the appellate court observed that the trial court had taken "extraordinary pains to craft measures calculated to minimize the adverse effects of the move on the father-child relationship, assuming those measures remain enforceable." (*In re Marriage of Condon* (1998) 62 Cal.App.4th 533, 540, 549 [73 Cal.Rptr.2d 33].) However, perhaps because the travel-trust funds came from money otherwise appropriated for spousal support (*id.* at p. 540), there was no issue on appeal about their validity as such.

*Payments* (1988) 22 Fam. L.Q. 319, 320 ["Based upon an assessment of sixty families, Wallerstein and Huntington concluded that there was a relationship between the frequency, regularity and flexibility of visitation and the payment of child support which emerged at eighteen months following separation and held over the five-year period of their study." (Fn. omitted)].)

In view of the Legislature's announced public policy in favor of visitation with the noncustodial parent, the benefits of such contact noted in the social science research, and the detriment to the child's personality development that results from its lack (see Adams, *Loving Your Children From a Distance*, *supra*, 33 Duq. L.Rev. at p. 158 ["Research shows that benefits to the child are derived from frequent contact with the noncustodial parent, and disadvantages are associated with less frequent contact."]), we cannot agree with any suggestion that might be extracted from *Gigliotti* that visitation cannot be a sufficient reason to vary the guideline amount in move-away cases.

Here, not only does the sheer distance and daunting logistics of visitation in South Carolina justify varying from the guideline amount, but there is the additional factor of active interference by the custodial parent with the noncustodial parent's relationship with his child. Increased visitation is particularly needed here to repair the damage. The judge's reason for varying the guideline amount—to turn the heart of an estranged daughter back to her father—eminently satisfied the articulation requirements of section 4056, subdivision (a)(2) through (3).

*Reduction of the Guideline Amount to Create a Travel Fund Within the Control of the Noncustodial Parent Is Within the Discretion of the Trial Court*

The remaining question, then, is whether the trial judge could provide funds to facilitate visitation by allowing the noncustodial parent to deduct an amount from the guideline and set that amount aside for the exclusive purpose of the concomitant travel. Preliminarily, we must note that the case relied on by Robin in this regard, *In re Marriage of Chandler* (1997) 60 Cal.App.4th 124, 128-130 [70 Cal.Rptr.2d 109] (unilateral decision to create trust fund for college and other expenses in order to limit custodial parent's access to additional support in high income case held abuse of discretion) is distinguishable. The main purpose of the trust in *Chandler* was to *limit*, in an exceptionally high income case (the noncustodial parent in the case was a member of the family which has owned the Los Angeles Times), the custodial parent's access to support funds in excess of what the trial court erroneously considered the child's current needs. (See *id.* at p. 129.) This court rejected such micromanagement of support money by the noncustodial parent: "Once the court determines the appropriate amount of child

support, the supporting parent has no right to determine whether these funds are used to buy groceries, pay rent or pay for music lessons." (*Id.* at p. 130.) Moreover, given the excess of support over the child's needs in *Chandler*, the trust was largely directed at creating a college fund for the future, after the child became an adult. The *Chandler* court held that the trial court had no authority to do so because it was, in effect, adult child support. (See *ibid.* ["a court has no authority to order a parent to support an adult child"]; cf. *In re Marriage of Serna* (2000) 85 Cal.App.4th 482, 484 [102 Cal.Rptr.2d 188] [relying in part on *Chandler* to strike down spousal support order that was, in effect, adult child support].)

Here, unlike *Chandler*, the trust is not directed at future needs such as college expenses, but at one very current and pressing need, namely, the restoration of the father-daughter relationship, a task made all the more difficult because of the move-away order. Unlike *Chandler*, the trust here does not allow the noncustodial parent to interfere or otherwise direct the custodial parent's use of support money; it is earmarked for one very worthy—and current—purpose, necessitated by the custodial parent's unilateral decision to move out of state. Finally, unlike *Chandler*, this is not a very high income case, where the appellate court was concerned that the trial court's trust order was a subterfuge to avoid allowing the child to share in the noncustodial parent's high standard of living (cf. § 4053, subd. (f)). The *Chandler* opinion devoted considerable effort to establishing that the child's reasonable needs varied (i.e., went up) with the noncustodial parent's "circumstances." (See *In re Marriage of Chandler, supra,* 60 Cal.App.4th at p. 129.)

In the case before us, given the rupture of the parent-child relationship and the need to repair it, there certainly is a "strong showing of necessity" justifying establishment of a trust. (Cf. *In re Marriage of Chandler, supra,* 60 Cal.App.4th at p. 128.) *Chandler* hardly constitutes a common law obstacle to the trial judge's attempt, in his own words, to do "everything we could to keep father involved in this child's life."

The other case that Robin relies on is *Gigliotti*. There is language in the *Gigliotti* opinion that might be read for the proposition that there is no authority for a trial court to deduct travel expenses from what the payor parent would otherwise owe in guideline child support.[7]

The language is dicta because the *Gigliotti* court was dealing with a case where the custodial parent was forced to incur travel expenses *for herself*:

---

[7]The language came in the form of a comment after a quotation from *In re Marriage of Fini, supra,* 26 Cal.App.4th 1033, which we ourselves quote in footnote 8, *post.* Here is what *Gigliotti* had to say about it: "To the extent that the court in *Fini* interpreted Family Code section 4062 to permit a reduction of the guideline amount of child support, or what it

She was "obligated" to accompany her young son on the plane from Massachusetts to California for quarterly visits. (*In re Marriage of Gigliotti, supra*, 33 Cal.App.4th at p. 528.) As between the two parents, the *Gigliotti* court emphasized that it was the custodial parent who "incurred the *greater* amount of travel expenses for visitation." (*Id.* at p. 529, original italics.) Under those circumstances, the case was certainly an appropriate one for invocation of section 4062, subdivision (b)(2), which allows a trial court to use its discretion to *increase* the amount of child support over the guideline "for travel expenses for visitation." (*Gigliotti, supra*, 33 Cal.App.4th at p. 529.)[8]

*Gigliotti* represents the unusual case where actually increasing the guideline amount might be justified because the *custodial* parent incurs costs for his or her own transportation. But it does not follow that a court cannot reduce the guideline amount to facilitate the noncustodial parent's visitation. As worthy of judicial criticism as the guideline statutes are (see, e.g., *In re Marriage of Schulze* (1997) 60 Cal.App.4th 519, 524, fn. 2 [70 Cal.Rptr.2d 488] ["a kind of hybrid of quantum physics and Zen philosophy"]; *County of Tulare v. Campbell* (1996) 50 Cal.App.4th 847, 851, fn. 2 [57 Cal.Rptr.2d 902] [agreeing that the scheme was " 'a sad state of affairs' "]; *In re Marriage of Carter* (1994) 26 Cal.App.4th 1024, 1029, fn. 5 [33 Cal.Rptr.2d 1] ["not understood by the legislators who enacted it"]; *In re Marriage of Fini, supra*, 26 Cal.App.4th at p. 1042 ["harsh, inflexible rules for child support which will inevitably cause hardship and inequity"]), they are not so totally inflexible that they will not allow downward adjustments for "special circumstances in the particular case." (§ 4057, subd. (b)(5).) As draconian as the guideline scheme is, the Legislature still could not bring itself to make the list of exemplary special circumstances mentioned in subdivision (b)(5)(A) through (C) of section 4057 exhaustive. Those examples are preceded with the words "These special circumstances include, *but are not limited to*, the following." (§ 4057, subd. (b)(5), italics added.)

denominated a 'negative add-on,' because of travel expenses for visitation incurred by the parent paying child support, we find no such authority therein or elsewhere in the code." (*In re Marriage of Gigliotti, supra*, 33 Cal.App.4th at pp. 528-529, italics omitted.)

[8]Section 4062, subdivision (b)(2) provides: "The court may order the following as additional child support: [¶] . . . [¶] (2) Travel expenses for visitation."

The counterintuitive use of the word "additional" in the statute was discussed by Justice King in *Fini*: "The statutory language concerning additional child support in the discretion of the court for travel expenses for visitation is confusing, because such expenses are usually incurred by the noncustodial parent who is paying child support. Under these circumstances, it is a misnomer to call it additional child support or an add-on, since incurring the financial burden of this expense usually will result in some reduction of the child support otherwise ordered. In this sense, although semantically peculiar, it might more properly be called a *negative add-on*." (*In re Marriage of Fini, supra*, 26 Cal.App.4th at p. 1039, fn. 5, italics added.)

Just because a circumstance is not mentioned in section 4057 does not mean ipso facto that it does not merit reducing support from the guideline amount. And given its importance to the child, and the practical necessity of a travel fund when a case presents the special circumstance of out-of-state visitation, the promotion of "frequent and continuing contact with both parents after the parents have separated" is certainly a factor which may mean that the rote application of the guideline formula is unjust or inappropriate in some cases. A case such as we have here, where the custodial parent has interfered with visitation rights, is a prime example.

Finally, there is the question of whether the trial court could properly allow the noncustodial parent to have control of the travel fund money. The matter of control under these circumstances is another example of the need for flexibility. The nitty-gritty of the question comes come down to which of the two parties is the more conscientious and reliable. The trial judge, who has the ability to observe the parties personally in a courtroom is, of course, in the best position to make that determination. No doubt there will be cases where prudence, or practicality, will dictate that the supported custodial parent have control over the money and be the one to set it aside to pay the plane fare to send the child back to California for visitation. But there will also be cases, such as the one before us, where (to say the least) the custodial parent has been shown to be unreliable in affording the noncustodial parent visitation, and therefore might be tempted to play games or dip into the trust fund. This is an aspect of visitation law which is least amenable to micromanagement by statute or the common law pronouncements of higher courts. Under the circumstances of the case before us, certainly, the trial judge did not abuse his discretion by allowing Michael to keep the money necessary to assure visitation.

In recognizing that there will be times when visitation expenses should be added on to the guideline amount as provided for in section 4062, as exemplified in *Gigliotti*, and times when visitation expenses should be subtracted from the amount, as provided for in section 4057 and exemplified here, the statutes are harmonized. Additionally, the common law policy in favor of maximum possible discretion within the confines of the statutes, as expressed in *In re Marriage of Fini, supra,* 26 Cal.App.4th at page 1044,[9] is facilitated.

---

[9]There the court stated, "[T]he court in child support proceedings, to the extent permitted by the child support statutes, must be permitted to exercise the broadest possible discretion in order to achieve equity and fairness in these most sensitive and emotional cases." (See also *County of Lake v. Antoni* (1993) 18 Cal.App.4th 1102 [22 Cal.Rptr.2d 804]; Summary of Sen. Bill. No. 1614 (1991-1992 Reg. Sess.), as reprinted in *In re Marriage of Fini, supra,* 26 Cal.App.4th at p. 1045.)

*Conclusion*

The judgment is reversed with directions to recalculate the child support according to the guidelines, which as a practical matter will mean feeding the appropriate variables into the DissoMaster. There is simply no way to avoid running the " 'dang things.' " (*In re Marriage of Whealon* (1997) 53 Cal.App.4th 132, 144 [61 Cal.Rptr.2d 559] [apt phrase coined by trial judge faced with statutorily mandated drudgery].)

It is likely, of course, that on remand the calculation of the guideline amount will result in a considerably increased figure over the $650 initial one, calculated when both parties were living in Orange County. Because the amount of child support must be recalculated, the trial judge should not assume the $150 a month travel fund figure is set in stone, and our opinion is without prejudice to either party in that regard.[10] The equities may be different in light of the recalculation.

Because this appeal results in what is essentially a split decision, each party will bear its own costs on appeal.

Rylaarsdam, J., and Bedsworth, J., concurred.

---

[10]Thus Robin will be free to argue that $150 is too much because Michael isn't using it all, and Michael is free to argue that it is too little because it doesn't allow him to see Amanda as much as he might otherwise have the right to.