Filed 3/26/26  Marriage of Gill CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re the Marriage of SONIA and ASHAM GILL. | |
| SONIA GILL,<br><br>　　Respondent,<br><br>　　　　v.<br><br>ASHAM GILL,<br><br>　　Appellant;<br><br>HARJIT GILL et al.,<br><br>　　Claimants. | F086671<br><br>(Super. Ct. No. 21CEFL04814)<br><br>**OPINION** |
| In re the Marriage of SONIA and ASHAM GILL. | |
| SONIA GILL,<br><br>　　Respondent,<br><br>　　　　v.<br><br>ASHAM GILL,<br><br>　　Appellant. | F087071<br><br>(Super. Ct. No. 21CEFL04814) |

APPEAL from orders of the Superior Court of Fresno County. Robert Mangano, Judge.

McCormick, Barstow, Sheppard, Wayte & Carruth and Todd W. Baxter for Appellant.

Law Office of Zeppy Attashian and Zepure Attashian for Respondent.

No appearance by Claimants.

-ooOoo-

This appeal arises from the dissolution of the marriage between appellant Asham Gill (Asham) and his wife Sonia Gill (Sonia).[1] During the course of the dissolution proceedings, the trial court ordered Ahsam to pay $19,310 per month in temporary family support, $347,580 in retroactive family support, and $79,447 in interim attorneys' fees. Asham contends the court erred by: (1) failing to calculate a valid support guideline figure under Family Code section 4055[2] that was based on actual monthly income, actual needs, and current circumstances; (2) deviating from the guideline support figure based on accounts that are owned by his parents; (3) finding that payments from accounts owned by his parents constituted gift income; (4) considering the fact that his parents paid for his attorneys' fees; (5) ordering him to pay retroactive family support without regard to credits for prior voluntary payments; and (6) awarding Sonia attorneys' fees without considering his current circumstances and ability to pay.

We conclude the trial court erred by not sufficiently establishing Asham's and Sonia's current respective incomes and by failing to perform a valid section 4055 support guideline calculation. These errors rendered the court's family support order, order for retroactive family support, and order for interim attorneys' fees insufficiently supported

---

[1]     Asham and Sonia share the same last name, as do Asham's mother, Balbir Gill (Balbir), and father, Harjit Gill (Harjit). In order to avoid confusion, we refer to the parties and Asham's parents by their first names. No disrespect is intended.

[2]     All further statutory references are to the Family Code.

and thus invalid. Accordingly, we reverse the court's orders and remand this matter for further proceedings on Sonia's motions.

## PROCEDURAL BACKGROUND

On November 23, 2021, Sonia filed a petition for dissolution of marriage and a request for a domestic violence restraining order (DVRO). Sonia sought to maintain possession of the family home on Piccadilly Avenue in Clovis (Piccadilly House) and a leased BMW automobile. Sonia also sought attorneys' fees and temporary family support, which is combined spousal and child support.

On January 11, 2022, at the DVRO hearing, the parties reached agreement as to methods of communication and child visitation. Asham also agreed to the imposition of a three-year restraining order and to Sonia maintaining temporary exclusive possession of the Piccadilly House and the BMW. The trial court entered an order consistent with the parties' agreement and continued the issues of attorneys' fees and temporary family support. The court also ordered proof of voluntary payments that Asham may have made to Sonia to be submitted at least 10 court days prior to the continued hearing.

On March 30, 2022, Sonia filed a request to join Asham's parents, Balbir and Harjit, as claimants in the dissolution proceeding. Sonia alleged that Balbir and Harjit claimed ownership interests in community assets, specifically, a retail property/shopping center, a laundromat, and two liquor businesses.

On April 14, 2022, Asham opposed Sonia's request to join his parents. Asham argued the properties were owned by his parents and the community had no interest in them. Asham also argued that his parents "covered the living expenses of the parties, including but not limited to mortgage and credit cards. The payments were withdrawn from [my parents'] bank accounts. However, that does not mean that [Sonia] or I have ownership or interest in [my parents'] bank funds."

On June 22, 2022, the trial court granted Sonia's request to join Asham's parents as claimants.

3.

On August 4, 2022, Sonia filed a trial brief in support of her request for attorneys' fees and temporary spousal support. In part, Sonia alleged that Asham earned $100,000 per month and requested $50,000 in interim attorneys' fees and $25,000 per month in family support.

Following a transfer to a different trial department and several continuances, a multi-day hearing on Sonia's request for attorneys' fees and family support was conducted on January 26 and 27, 2023, and March 14, 2023, through March 17, 2023. During the course of the multi-day hearing, testimony from Sonia, Asham, Balbir, and Michelle Ellis, Sonia's expert certified public accountant, was taken and many exhibits were received.

At the conclusion of the hearing on March 17, 2023, the court made an interim award of attorneys' fees under sections 2030 and 2032 in favor of Sonia for $35,000. The court found there was a disparity in funds between Asham and Sonia because Asham continued to have access to his parents' business bank accounts and Sonia did not. The court also found that Asham had the ability to pay both his and Sonia's fees through his parents' business bank accounts. The court stated that it had considered section 4320, subdivisions (c), (d), and (e). The court noted that it was to consider income and expenses but also noted that it could consider regular and substantial infusions of money to one spouse.

In May 2023, the parties filed closing briefs and closing reply briefs.

On May 30, 2023, the trial court issued an oral order on Sonia's request for family support and attorneys' fees. The trial court ordered Asham to pay family support of $19,310 per month starting June 1, 2023, and retroactive payments from December 2021. The court set a further hearing for June 23, 2023, regarding the issues of attorneys' fees and family support credits.

On June 23, 2023, the trial court conducted a hearing regarding attorneys' fees, the amount of retroactive family support owed by Asham, and any credits for prior voluntary

4.

payments by Asham. The court ordered Asham to pay $347,580 for 18 months of retroactive support. With respect to credits, Asham was ordered to submit documentary evidence no later than noon on July 13, 2023. With respect to attorneys' fees, Sonia was to submit additional billing records no later than noon on July 13, 2023.

On July 11, 2023, Sonia submitted additional evidence in support of her request for attorneys' fees.

On July 13, 2023, Asham presented additional evidence regarding credits against the retroactive family support. Asham argued that he was entitled to $160,974 in credits. Also on July 13, 2023, the court issued its formal statement of decision/family support order (FSO) consistent with its May 30 oral order.

On July 25, 2023, Asham filed a declaration that sought in part to further explain his current financial circumstances and his inability to pay Sonia's attorneys' fees.[3]

On July 31, 2023, Asham filed a notice of appeal regarding the July 13, 2023 statement of decision.

On September 1, 2023, the trial court issued a minute order that granted Sonia additional interim attorneys' fees and costs under sections 2030 and 2032 for a total amount of $79,447. The court found under section 2032 that there was a disparity in access to funds between Asham and Sonia, and that Asham was able to pay both his and Sonia's attorneys' fees. The order did not establish the manner or schedule for payment of the attorneys' fees. The order also did not address Asham's request for $160,974 in credits against the $347,580 in retroactive family support.

---

[3] Asham filed a motion on July 27, 2023, to modify the family support order. As of the filing of Asham's opening brief, that motion was still pending. Asham states that his July 27 motion may not affect the amount of temporary child support ordered up to July 27, 2023, or the amount of retroactive support ordered. Sonia does not address Asham's July 27 motion in her respondent's brief. Given the parties' apparent agreement that Asham's July 27 motion does not materially affect the issues raised in this appeal, we merely note, as did Asham, that his July 27 motion has been filed and remains pending.

On September 12, 2023, Asham's designation of record on appeal included the court's September 1 order on attorneys' fees.

## FACTUAL BACKGROUND

### General Background

Sonia and Asham were married in August 2011 but separated in November 2021. Asham's parents spent about $300,000 on the wedding and a two-month long honeymoon, which involved visiting seven countries. Some of the honeymoon was part of and paid for by Sonia's MBA program. Asham and Sonia had three children, who were born in July 2013, March 2015, and June 2019. Except for a period of about six months between 2017 and 2018 in which Sonia and Asham separated, it appears that Sonia and Asham lived together continuously before November 2021.

During the marriage, Asham's parents in part owned a commercial park, a laundromat, and Liquor Locker I and Liquor Locker II ("the Liquor Lockers"), all located in Selma.[4] Asham worked at various times throughout the marriage at the Liquor Lockers and has received a W-2 form from the stores since 2009. However, Asham was not issued regular pay checks for working at the Liquor Lockers. It was not until sometime in 2022 or 2023 that Asham began receiving a paycheck from the Liquor Lockers. Instead of paying their expenses through a paycheck and their own bank accounts, it appears that all of Asham's and Sonia's living expenses were paid through two business bank accounts owned by Asham's parents (the Business Accounts). Income from Balbir and Harjit's businesses were deposited into the Business Accounts. Sonia

---

[4] The issue of whether Sonia and Asham have a community property interest in the three businesses remains pending in the trial court. Because the trial court made no findings regarding the ownership interests in these businesses, and because it is unnecessary for us to determine the precise ownership structure of these businesses to resolve this appeal, for convenience, we assume for purposes of this appeal only that Balbir and Harjit fully own the businesses.

6.

and Asham had access to the Business Accounts and would electronically pay their bills and living expenses through these accounts.

In July 2020, Sonia received a Small Business Administration loan for $57,000 to start a laundromat. However, the laundromat was ultimately not opened. Instead, in October 2020, Asham and Sonia opened a Chicken Shack restaurant in Selma. Asham's parents loaned Asham and Sonia $80,000 (from a savings account, not the Business Accounts) to start the Chicken Shack. Both Asham and Sonia worked at the Chicken Shack, which caused Asham to work less at the Liquor Lockers. Also, Sonia and Asham purchased a Dodge truck to help conduct Chicken Shack related business. Asham still drives the Dodge truck, but it is registered in Sonia's name. The payments for the truck are $1,773 per month.

Sometime in 2021, Sonia and Asham leased a BMW automobile. The BMW is registered in Asham's name, but Sonia drives it. The car payments for the BMW are $1,353 per month.

In June 2021, Sonia and Asham purchased the Piccadilly House. Sonia's parents gave Asham and Sonia $30,000 towards a downpayment, while Asham's parents gave them $175,000.[5] As of the 2023 hearing, the monthly mortgage payments on the Piccadilly House were about $3,100. In obtaining a loan for the Piccadilly House, Asham disclosed income to the mortgage company of $10,000 per month. Prior to purchasing the Piccadilly House, Sonia and Asham lived at a home rent free in Selma that was owned by Asham's parents.

Although the Chicken Shack at one time was profitable, the business ultimately failed and closed in May 2022. Prior to closing, Sonia began drawing a $3,000 monthly salary from the Chicken Shack in December 2021. Asham never drew a salary from the

---

[5] Of note, Asham testified at trial that the $30,000 from Sonia's parents and the $175,000 from his parents were actually loans that he had to repay. However, Asham was impeached with gift letters regarding both amounts. Therefore, the total downpayment was composed of gifts, not loans.

7.

Chicken Shack. After closing down, the State imposed a lien of $68,000 due to Asham and Sonia failing to pay sales taxes from their operation of the Chicken Shack. Asham currently pays $2,800 per month on the Chicken Shack tax lien.

***Asham's Testimony***

In relevant part, Asham testified that when he and Sonia wed, they paid for some of the honeymoon through money received as wedding gifts, while his parents paid for the rest. Some of the honeymoon was related to Sonia's MBA program. Apart from the honeymoon, Asham and Sonia rarely vacationed.

Asham testified that he is currently employed at the Liquor Lockers and has worked there since he was in high school. Asham currently earns a salary of $120,000 per year/$10,000 per month and lives with his parents. With respect to how he was paid and how his and Sonia's living expenses were paid during marriage, Asham's testimony was not always clear or consistent. For example, when asked about his income and expenses for 2018 and 2019, Asham testified that he did not receive a paycheck for working at the Liquor Lockers, but that he would pay his expenses from his paycheck. Asham also at times testified that the amount his parents spent for his and Sonia's living expenses was the same amount as what he earned working at the Liquor Lockers; at other times, Asham indicated that the living expenses exceeded what he earned, and his parents paid the excess. Ultimately, Asham's testimony was that, as evidenced by W-2 forms, he was paid a salary for working at the Liquor Lockers. However, he was not issued a physical paycheck, and his salary was not deposited into his own individual bank account. Instead of receiving a paycheck, Asham and Sonia would pay their living expenses from his parents' Business Accounts. Although the limit of Asham and Sonia's living expenses was supposed to be Asham's salary for working at the Liquor Lockers, they would exceed that amount, and his parents would allow the excess to be paid through their Business Accounts. Asham is not a signer on the Business Accounts, and he must have permission to get money from these accounts.

Asham testified that 2020 was the year he first began to make $120,000 per year for working at the Liquor Lockers. This was an increase in pay compared to 2019 and was based on an increase in the number of hours worked at the two stores. Due to working at the Chicken Shack, however, Asham did not earn $120,000 in 2021 or 2022. Nevertheless, Asham's parents paid for the living expenses in 2021 and 2022, even though the living expenses (either Asham and Sonia's joint expenses or Asham's individual living expenses postseparation) exceeded Asham's salary for working at the Liquor Lockers.

Asham testified that he began to receive paychecks sometime in 2022 and that his paycheck would be deposited into a personal checking account. Also in 2022, Asham paid Sonia several thousand dollars through Apple pay, and the funds came either from his personal account, the Business Accounts, or "Apple cash." The budget set by his parents was intended to be his $10,000 monthly salary for working at the Liquor Lockers. Asham pays his living expenses from his personal checking account, but if his expenses exceed his $10,000 monthly salary, those expenses are paid from his parents' Business Accounts.

Asham testified that the monthly utilities for the Piccadilly House, the monthly mortgage related expenses (including taxes, insurance, and home owners' association dues) for the Piccadilly House, car payments for the BMW, grocery expenses for Sonia and the children, child care and after-school programs/activities, life insurance premiums, the $2,800 monthly tax lien payments, attorneys' fees, and miscellaneous requests for funds by Sonia, in addition to his own expenses (such as the monthly payment on the Dodge truck), are all currently paid through his $10,000 monthly salary and help from his parents through the Business Accounts. However, Asham acknowledged that the majority of the payments come from his parents' Business Accounts and that his parents completely paid for his attorneys. In other words, as of the March 2023 hearing, Asham's parents continue to help and financially support him if he goes over his $10,000

monthly salary/budget. From January 1, 2022, to the present, Asham's parents have paid more than $10,000 a month to pay his salary and expenses.

***Balbir's Testimony***

In relevant part, Balbir testified that from 2011 to the present, Asham has worked at the Liquor Lockers, except for several months when he was trying to run the Chicken Shack. Asham physically worked at the Liquor Lockers doing "everything," including stocking and ordering. Balbir caused W-2 income tax forms to be issued to Asham for his work at the Liquor Lockers.

When asked about how Asham was paid for work at the Liquor Lockers, Balbir often invoked her Fifth Amendment right against self-incrimination based on the advice of her counsel. Nevertheless, Balbir testified that from 2017 through 2021, Asham and Sonia had permission to access the Business Accounts to pay their bills and living expenses (including Sonia's credit card bills). Asham and Sonia had the Business Account numbers, and they would pay their bills and expenses on-line using those numbers. However, Asham and Sonia did not otherwise have authority to make withdrawals or to write physical checks from the Business Accounts, and Asham was not a signer on the Business Accounts.

Balbir testified that Asham had a salary from working at the Liquor Lockers and that the bills and living expenses that Asham and Sonia paid from the Business Accounts were expected to stay within the limits of that salary. Because the monthly living expenses paid by Sonia and Asham through the Business Accounts would equal or exceed Asham's monthly salary, Balbir would not issue Asham a paycheck. It was not until January 2023 that Balbir began issuing Asham a paycheck.

Balbir testified that there were times when Asham and Sonia's spending exceeded Asham's monthly salary from the Liquor Lockers. Balbir testified that Asham and Sonia's expenses were not high from 2017 to 2019 but began to get very high in 2020. Balbir complained to Asham and Sonia that Sonia's spending/credit card bills were too

10.

high and exceeding Asham's salary. Balbir told Sonia several times that the excessive spending was causing the Business Accounts to fall short of money and be overdrawn, which in turn caused Balbir and Harjit hardship and made it difficult for them to pay their own bills.

Balbir testified there were a few times in which there were insufficient funds in the Business Accounts to pay Sonia's Apple Card bill. Balbir acknowledged two specific instances of payment reversals due to insufficient funds:[6] one in August 2021 involving a payment of $8,670 and the other in October 2021 involving a payment of $4,588.[7] Although Sonia would lower her spending one month, the next month it would be too high. In August or September 2021, Balbir eventually blocked Sonia's access to the Business Accounts because Sonia's spending was too high and was causing the Business Accounts to have too little money. Sonia made no withdrawals from the Business Accounts in 2022, and from around 2022 to the present, Balbir has not paid Sonia's credit card bills.

Balbir testified that Asham has been living with her and Harjit since around November 2021. Balbir did not know if Asham's living expenses exceeded his salary in 2022. However, Balbir continued to pay Asham's living expenses in 2022 in lieu of a paycheck, and Balbir and Harjit wanted to help with those living expenses. Balbir also paid for Asham's living expenses during months that Asham was working at the Chicken Shack because she and Harjit wanted to help. Balbir continues to pay Asham's living

---

[6]    Additionally, Sonia's December 2021 Apple Card statement shows a reversal for insufficient funds on December 2, 2021. The statement indicates that the unsuccessful transfer was from one of the Business Accounts and that the amount of the attempted transfer was $5,300. Also, Sonia's January 2022 Apple Card statement shows a reversal due to insufficient funds on January 6, 2022. The statement indicates that the unsuccessful transfer was from one of the Business Accounts and that the amount of the attempted transfer was $3,846.

[7]    Both of these bills were later successfully paid by transfers from the Business Accounts.

expenses through 2023. Balbir testified that Asham's expenses relating to the Piccadilly House, the BMW and Dodge truck, and food were paid by her and Harjit from the Business Accounts in 2022. When asked if she was willing to pay for a separate place to live for Asham, Balbir responded that she was willing to do so. However, after saying that, Balbir changed her testimony and stated she was not willing to pay for a separate residence.

Finally, with respect to attorneys' fees, Balbir testified that she has paid Asham's fees through the time of the hearing in March 2023. Balbir did not know if she would continue to pay the fees. If she could no longer afford to pay the fees, Balbir stated she would stop paying them.

### Sonia's Testimony

In relevant part, Sonia testified that during marriage, she and Asham lived a lavish lifestyle and never struggled for money. They would take spontaneous vacations, and Sonia would get her hair and nails done and purchase luxury items such as designer shoes and purses whenever she wanted. Although she provided Ellis with most of the marital expenses documentation, Sonia testified that Ellis's analysis did not include all expenses. Sonia estimated that Asham earned $100,000 per month because that is what he told her his earnings were.

Since separation, Sonia testified she has been financially "cut off" and cannot maintain her preseparation standard of living without family and child support from Asham. Sonia began to be "financially cut off" by Asham's parents around August or September 2021, just prior to separation. During the marriage, Sonia paid her credit card bills from the Business Accounts, and she had no limits on the amount of money she could spend per month. Sonia had the Business Account numbers and would either pay her bills on-line or by telephoning the credit card company. Sonia testified that during marriage, she did not have a personal savings account and was told by Asham and his parents that all of Asham's parents' accounts were also Sonia and Asham's accounts.

12.

However, Sonia was never a signer on the Business Accounts, was not given a checkbook related to the Business Accounts, and, although she or Asham were given a credit card to use on occasion, she was not issued a credit card for the Business accounts.

Sonia testified she was able to find employment with the State Water Board in November 2022. Prior to her employment with the State Water Board, she earned a total of $16,500 in 2022 from working at the Chicken Shack. Sonia described her current monthly paycheck from the State Water Board as reflecting $5,518 in gross pay and deductibles for retirement and health insurance. Prior to marriage, Sonia worked at Wells Fargo and had a 401K account that was worth approximately $54,000 in March 2022. Sonia has not made any mortgage payments on the Piccadilly House since 2021.

### Ellis's Testimony

In relevant part, Ellis testified she is a Certified Public Accountant and a Certified Evaluation Analyst and that she was retained by Sonia to perform a marital standard of living analysis. Ellis explained that a marital standard of living analysis looks at the spending habits of a married couple during their marriage, usually focusing on the two years prior to separation. Ellis explained that a typical martial standard of living evaluation involved an examination of bank and credit card statements in order to understand the couple's spending habits.

In this case, Ellis testified that she conducted an analysis of Asham's and Sonia's spending from January 1, 2020 to November 30, 2021.[8] Ellis did not analyze Sonia and Asham's income or determine community assets and debts/obligations. Ellis reviewed Asham and Sonia's bank account (which had virtually no activity), credit cards from Wells Fargo and Apple that were in Sonia's name, various invoices, utility bills, and

---

[8] Ellis included some credit card charges (generally relating to beauty/hair care) that were incurred by Sonia after separation. Ellis explained that she did this because Sonia told her that she (Sonia) regularly incurred such expenses preseparation, she could not find additional documentation, but the postseparation expenses were very similar to the preseparation expenses.

other billing statements. Ellis understood that Asham and Sonia's expenses were paid through the Business Accounts, but she did not have any of Asham's parents' bank statements, including statements that would show from which accounts Asham and Sonia's expenses were paid. Also, Ellis's analysis did not take into consideration any spending done by Asham alone, although some of the expenses from Sonia would likely involve or benefit Asham (for example grocery bills). Ellis's analysis also did not account for any spending that might have been done with cash. Ellis noted an absence of savings activity by Sonia and Asham and an absence of travel related expenses.

Ellis concluded that the records reflected an average of $19,574 in monthly expenditures/expenses, with the understanding that information regarding Asham's spending was absent. This included on average $4,389 in expenses related to the Piccadilly House; $3,473 in expenses related to the BMW and Dodge truck; and $8,455 in monthly credit purchases ($5,703 on the Apple Card and $2,752 on the Wells Fargo card).[9] Ellis understood that all of Sonia's and Asham's expenses were always paid.

***Trial Court's Statement Of Decision***

The trial court's FSO made general findings and specific findings related to child support, spousal support, and the appropriate amount of total monthly family support.

**A.     General Findings**

The trial court found Asham to be generally not credible and rejected "most" of his testimony. The court noted that Balbir often contradicted Asham, and documentary evidence also contradicted him at times. Although the court stopped short of finding that Asham perjured himself, it noted that Asham made statements under oath that appeared to be false. Also, despite testimony to the contrary, the court found that Asham's salary for working at the Liquor Lockers was generally insufficient to cover Asham and Sonia's

---

[9]     Ellis acknowledged that Sonia's Apple credit card statements for March and November 2021 reflected payment reversals.

living expenses. There were times when the balance owed (and paid) on Sonia's Apple credit card alone neared or exceeded $10,000.

With respect to the Business Accounts, the trial court found these accounts were essentially Asham and Sonia's own accounts. The court noted there were no restrictions that were actually placed on Asham and Sonia's use of the Business Accounts, all of Asham and Sonia's living expenses were paid from only these accounts, and Asham and Sonia did not have to ask permission from Asham's parents before they paid their expenses from these accounts. In the alternative, the court found the use of and payments from the Business Accounts were so regular and reoccurring that the amounts spent by Asham and Sonia from these accounts constituted gift income. The court also noted that Asham's assertion that his financial arrangements with his parents was a function of custom and culture was consistent with the court's own experiences from other cases. Sometimes children subsidize their parents, and sometimes parents subsidize their children. The court found that Asham's parents subsidized his lifestyle during marriage, after separation, and "to this day." The subsidization included paying the fees of Asham's attorney. Nevertheless, the court noted that Balbir's payment practices raised significant IRS related concerns.

## B. Child Support Findings

The trial court noted the requirements regarding child support found in sections 4050 through 4076. The court also recognized that it had the authority to deviate from a section 4055 guideline calculation in "special circumstances." Pursuant to former section 4057, subdivision (b)(5) (now § 4057, subd. (b)(6))[10] and *In re Marriage of*

---

[10] Section 4057 was amended in January 2024. Former section 4057, subdivision (b)(5) and current subdivision (b)(6) contain identical language. Both sections provide that the presumption of correctness enjoyed by a valid section 4055 guideline calculation can be rebutted by showing the "[a]pplication of the [guideline] formula would be unjust or inappropriate due to special circumstances in the particular case," and then list four non-exclusive examples of "special circumstances." (Cf. former § 4057, subd. (b)(5) with § 4057, subd. (b)(6).) Because the language of former section 4057, subdivision

15.

*De Guigne* (2002) 97 Cal.App.4th 1353, due to the significant wealth and assets involved (presumably from the Business Accounts), a deviation from a section 4055 guideline calculation was appropriate and in the best interests of the three children.

### C. Spousal Support Findings

In part, the trial court emphasized that it was making a temporary spousal support order and thus was not bound by cases and statutes that deal only with permanent spousal support orders. The court noted it was to consider the moving party's needs and the non-moving party's ability to pay. The court stated that even though it was deviating and making a "non-guideline" order, it was required to have a guideline calculation for reference. To meet this obligation, the court adopted and incorporated the section 4055 guideline calculation submitted by Asham in his closing brief. This section 4055 guideline calculation was identified as "Exhibit A" to the FSO. Exhibit A is a Dissomaster computer program calculation that indicates it is for the year 2023 (the 2023 Dissomaster). The 2023 Dissomaster listed Asham's monthly income as $70,000 and Sonia's monthly income as $16,500. Using these two income figures, the 2023 Dissomaster yielded a monthly child support figure of $8,273, a monthly spousal support figure of $6,895, and a total monthly family support figure of $15,168. In addition, although the court stated it considered "income" as defined by the Family Code for purposes of child and spousal support, it also considered in the alternative the section 4320 permanent spousal support factors.[11] The court addressed several cases cited by Asham and found them to be distinguishable. For example, the court found that *In re Marriage of Smith* (1990) 225 Cal.App.3d 469 was distinguishable because neither Asham nor Sonia were working excessive or unrealistic hours, their bills and living

(b)(5) is identical to current section 4057, subdivision (b)(6), all further citations will be to current section 4057, subdivision (b)(6).

[11]  The court's discussion of section 4320 generally consisted of identifying the factors, but with little discussion in terms of explaining how the factors applied in this case.

expenses were always paid, and Asham and Sonia were not living beyond their means. The court also found Ellis's marital standard of living analysis to be extremely helpful and persuasive. The court generally rejected Asham's criticisms of Ellis's analysis and found that her testimony was reasonable and credible. Finally, the court extensively analyzed various charges and expenses from Sonia's credit cards that were relied upon by Ellis. The credit card balances were substantial and, while there were some instances in which an electronic payment was rejected for insufficient funds, the balances were ultimately always paid. The court, however, made some undisclosed adjustments to Ellis's marital standard of living analysis based on concessions and minor errors in the figures used in the calculation.

### D. Amount of Family Support

After considering the evidence submitted, as well as adjustments made to Ellis's marital standard of living analysis, the trial court exercised its discretion and ordered Asham to pay Sonia $19,310 per month in temporary family support.

## DISCUSSION

## I. Propriety of the Monthly Family Support Award

### A. *Parties' Arguments*

Asham argues the trial court made a number of errors and abused its discretion by imposing the $19,310 per month family support award. In relevant part, Asham first argues the court failed to properly calculate his and Sonia's respective current incomes. Asham argues the court instead improperly concluded that the Business Accounts were either Asham's and Sonia's accounts or a gift of money. Asham argues this was erroneous because there was no evidence as to the value of the Business Accounts, or that Sonia and Asham had an ownership interest in the accounts, or that Asham was receiving the same amount of gift income at the time of the hearing as he and Sonia had been receiving preseparation. Asham argues the failure to calculate income in part resulted in a failure to adequately consider his ability to pay the amount ordered for family support.

17.

Second, Asham argues the court improperly failed to conduct a valid section 4055 guideline support calculation for purposes of child support. Asham contends the court erred in adopting the 2023 Dissomaster because the 2023 Dissomaster was not submitted in order to set a monthly family support figure and because the figures used by the 2023 Dissomaster are not supported by substantial evidence. Third, Asham argues the court erred by deviating from the 2023 Dissomaster in part because the 2023 Dissomaster is an invalid calculation. Based on these errors, Asham argues the FSO must be reversed.

Sonia argues the trial court did not err and that its express and implied findings are supported by substantial evidence. In relevant part, Sonia first argues the court found that Asham earned $70,000 per month and this figure was supported by Sonia's testimony that Asham earned $100,000 per month, Ellis's marital standard of living analysis, Asham's admission that he had access to the Business Accounts, and Asham's own 2023 Dissomaster report. Sonia also argues the court properly concluded that Asham and Sonia were able to pay all of their living expenses and to support their lifestyle through the regular and recurring monetary gifts from the Business Accounts. Asham admitted that his parents paid for his living expenses and that the expenses exceeded his purported monthly salary. Sonia contends the court properly considered Asham's ability to pay based on the regular gift income from his parents and the marital lifestyle that Asham's wages and income were able to support. Based on this evidence, as well as on a rejection of Asham's testimony, Sonia argues the trial court properly concluded that Asham had the ability to pay the ordered family support. Finally, Sonia contends the court properly adopted the 2023 Dissomaster and properly exercised its discretion to deviate from the child support figure contained therein. Sonia argues that Asham's use of the Business Accounts demonstrate he has access to significant wealth, and it was in the children's best interest to make a deviation.[12]

---

[12] Sonia also argues Asham forfeited errors relating to the child support calculation by failing to make objections to the trial court. It is true that appellate courts may treat errors regarding child support computations as forfeited by a failure to object. (*In re*

## B.   *Legal Standards*

### 1.   **Family Support Orders**

In California, orders that are "otherwise in compliance with the statewide uniform guideline may designate as 'family support' an unallocated total sum for support of the spouse and any children without specifically labeling all or any portion as 'child support' as long as the amount is adjusted to reflect the effect of additional deductibility," but the "amount of the order shall be adjusted to maximize the tax benefits for both parents." (§ 4066.) A "family support order" is "an order or judgment, that combines child support and spousal support without designating the amount to be paid for child support and the amount to be paid for spousal support." (§ 92.) A family support order should reflect the current circumstances of the parties at or reasonably near the time it is issued. (See *In re Marriage of Riddle* (2005) 125 Cal.App.4th 1075, 1081; *In re Marriage of Tydlaska* (2003) 114 Cal.App.4th 572, 575; *In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 298; *In re Marriage of Smith* (2001) 90 Cal.App.4th 74, 83; *In re Marriage of Sinks* (1988) 204 Cal.App.3d 586, 592.)

*Marriage of Alter* (2009) 171 Cal.App.4th 718, 738 (*Alter*).) However, Asham's arguments on appeal involve the court's failure to follow sections 4055 and 4057, the failure to determine his income, and the insufficiency of the evidence to support the 2023 Dissomaster and the FSO. A contention that a judgment is not supported by substantial evidence is not forfeited by a failure to raise the issue below. (*Kaushansky v. Stonecroft Attorneys, APC* (2025) 109 Cal.App.5th 788, 798.) Also, a party does not waive legal errors appearing on the face of a decision by failing to object. (*Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 59.) Further, considering the important policy considerations embodied by the child support statutes (*In re Marriage of Usher* (2016) 6 Cal.App.5th 347, 356), we are not necessarily bound by any forfeiture that may have occurred. (Cf. *In re A.H.* (2025) 115 Cal.App.5th 1217, 1227 [noting that appellate courts have discretion to excuse forfeiture in cases presenting important legal issues]; *Redevelopment Agency v. City of Berkeley* (1978) 80 Cal.App.3d 158, 167 [noting that application of the general rule of forfeiture is largely a discretionary matter].) Finally, the errors committed are significant and affect both the child support and spousal support components of the FSO. Given these considerations, we will not apply the forfeiture rule.

### 2.    Temporary Spousal Support

During the pendency of any proceeding for dissolution of marriage, the court may order "either spouse to pay any amount that is necessary for the support of the other spouse." (§ 3600; *In re Marriage of Pletcher* (2021) 68 Cal.App.5th 906, 912 (*Pletcher*).)  Unlike permanent spousal support which provides for financial assistance for a spouse as determined by the spouse's financial circumstances after a division of community property, temporary spousal support under section 3600 is meant to " ' "maintain the living conditions and standards of the parties in as close to the status quo position as possible pending trial and the division of their assets and obligations." ' " (*In re Marriage of Wittgrove* (2004) 120 Cal.App.4th 1317, 1327 (*Wittgrove*); see *Pletcher*, at p. 912.)  The trial court has broad discretion to set the amount of temporary spousal support based on the supported spouse's need and the supporting spouse's ability to pay. (*Pletcher*, at pp. 912–913; *Wittgrove*, at p. 1327; *In re Marriage of Czapar* (1991) 232 Cal.App.3d 1308, 1316.)  In exercising this broad discretion, a trial court may properly consider the "big picture" of the parties' assets and income available for support in light of the marriage standard of living. (*In re Marriage of Lim & Carrasco* (2013) 214 Cal.App.4th 768, 773; *Wittgrove*, at p. 1327.)  Although the trial court also has the discretion to consider statutory factors applicable to awards of permanent spousal support (*In re Marriage of Left* (2012) 208 Cal.App.4th 1137, 1153), consideration of those factors is not required[13] (*In re Marriage of Frietas* (2012) 209 Cal.App.4th 1059, 1071; *Czapar*, at p. 1316), and the court is "not restricted by any set of statutory guidelines in fixing a temporary spousal support amount." (*Pletcher*, at p. 912; *Wittgrove*, at p. 1327.)  A trial court's order awarding temporary spousal support is reviewed under the abuse of discretion standard. (*Lim & Carrasco*, at p. 773; *Wittgrove*, at p. 1327.)  The court's

---

[13]    Section 3600 does require the trial court to consider section 4320, subdivisions (i) and (m) when making a temporary spousal support order. (§ 3600.)  However, these two subdivisions of section 4320 have no application to this appeal.

factual findings made in support of a temporary spousal support order are reviewed under the substantial evidence standard. (*Lim & Carrasco*, at p. 774.)

### 3. Temporary Child Support

Child support awards are reviewed under the abuse of discretion standard. (*In re Marriage of Morton* (2018) 27 Cal.App.5th 1025, 1038 (*Morton*); *Y.R. v. A.F.* (2017) 9 Cal.App.5th 974, 982–983 (*Y.R.*).) "When conducting an abuse of discretion review, appellate courts consider (1) whether the trial court's factual findings are supported by substantial evidence, (2) whether the trial court followed applicable legal principles, and (3) whether the trial court reasonably exercised its discretionary authority—that is, whether any judge reasonably could have made such an order." (*In re Marriage of Hein* (2020) 52 Cal.App.5th 519, 529 (*Hein*); see *Y.R.*, at p. 983.) However, child support awards are highly regulated by statute. (*Hein*, at p. 529; *Y.R.*, at p. 983.) Indeed, courts have described California's child support statutes as "a legal world unto themselves." (*In re Marriage of Hall* (2000) 81 Cal.App.4th 313, 316 (*Hall*).) The child support statutes apply even if a child support award is designated as one for "family support." (§ 4074.) Because of the highly regulated nature of child support orders, "the only discretion trial courts possess is the discretion provided by statute or rule." (*Hein*, at p. 529; *Morton*, at p. 1039; *Y.R.*, at p. 983.) A trial court may abuse its discretion by applying improper criteria, making incorrect legal assumptions, being influenced by an erroneous understanding of the law (*Y.R.*, at p. 983), or relying on factual findings that are not supported by substantial evidence. (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711; *Beames v. City of Visalia* (2019) 43 Cal.App.5th 741, 767.) "Substantial evidence" does not mean " 'any evidence,' " nor does it mean speculation or conjecture; rather, "substantial evidence" is " 'evidence of ponderable legal significance, evidence that is reasonable, credible and of solid value.' " (*In re Marriage of Burwell* (2013) 221 Cal.App.4th 1, 24, fn. 21; *Feduniak v. California Coastal Com.* (2007) 148 Cal.App.4th 1346, 1360.)

California provides for a statutory uniform guideline for determining the appropriate amount of child support. (*Hein*, *supra*, 52 Cal.App.5th at p. 527; *Morton*, *supra*, 27 Cal.App.5th at p. 1038; *Y.R.*, *supra*, 9 Cal.App.5th at p. 983.) The child support guideline is a mathematical formula set forth in section 4055. (§ 4055; *Hein*, at p. 527; *Haley v. Antunovich* (2022) 76 Cal.App.5th 923, 927 (*Haley*); *Morton*, at p. 1038; *Y.R.*, at p. 983.) The total net monthly disposable income of both parents is an important component of the guideline formula. (§ 4055, subds. (b)(1)(B), (E); *Morton*, at p. 1038.) Thus, the section 4055 calculation requires an accurate assessment of each parent's income. (*Hall*, *supra*, 81 Cal.App.4th at p. 317; see *County of Orange v. Smith* (2005) 132 Cal.App.4th 1434, 1446 ["In order to apply the guidelines, one must ascertain the income of the parents."].) Monthly net disposable income is determined by dividing a parent's annual disposable income by 12. (§§ 4055, subd. (b)(2), 4059; *Morton*, at p. 1038; *Anna M. v. Jeffrey E.* (2017) 7 Cal.App.5th 439, 446 (*Anna M.*).) Annual net disposable income is in turn derived by subtracting statutorily enumerated deductions from the parent's annual gross income. (§ 4059; *Morton*, at p. 1038.) Annual gross income is broadly defined in relevant part to mean "income from whatever source derived." (§ 4058, subd. (a); *Morton*, at p. 1038; *Anna M.*, at p. 446.)

The amount generated from the section 4055 calculation is presumptively correct in all cases. (§§ 4053, subd. (k), 4057, subd. (a); *Hein*, *supra*, 52 Cal.App.5th at p. 527; *Morton*, *supra*, 27 Cal.App.5th at p. 1038; *Y.R.*, *supra*, 9 Cal.App.5th at p. 983.) The presumption can be rebutted, and the amount of child support can be increased or decreased from the guideline amount, but only under the special circumstances enumerated by section 4057, subdivision (b). (§§ 4052, 4057; *Morton*, at p. 1038; *Anna M.*, *supra*, 7 Cal.App.5th at p. 446; *In re Marriage of Bodo* (2011) 198 Cal.App.4th 373, 385.) If a trial court exercises its discretion and finds that a special circumstance under section 4057, subdivision (b) exists, then section 4056 requires the court to state on the record or in writing what the guideline formula number is, what the reasons are for

deviating from that number, and why the amount actually ordered is consistent with the child's best interests. (§ 4056, subd. (a); *Y.R.*, at p. 984; see *Hall, supra*, 81 Cal.App.4th at p. 317; *In re Marriage of Whealon* (1997) 53 Cal.App.4th 132, 144–145 (*Whealon*).) In setting the amount of child support, courts must adhere to the principles articulated in section 4053, including: the first and principle obligation of parents is to support their children according to the parents' circumstances and station in life; both parents are mutually responsible for the support of their children; the guideline takes into account each parent's actual income and level of responsibility for the children; and each parent should pay for the support of their children according to the parent's ability. (§ 4053; *Haley, supra*, 76 Cal.App.5th at p. 927.)

Because a trial court must know what a guideline formula result is before the court can deviate from it (*In re Marriage of Macilwaine* (2018) 26 Cal.App.5th 514, 527–528, 534 (*Macilwaine*); *In re Marriage of Hubner* (2001) 94 Cal.App.4th 175, 184 (*Hubner*), trial courts cannot "escape making a formula calculation pursuant to section 4055." (*Hall, supra*, 81 Cal.App.4th at pp. 316–317; see *Y.R., supra*, 9 Cal.App.5th at p. 983; *Wilson v. Shea* (2001) 87 Cal.App.4th 887, 891 (*Wilson*); see also *Whealon, supra*, 53 Cal.App.4th at pp. 144–145.) The failure of a trial court to comply with sections 4055 or 4056 requires reversal of the order and remand to the trial court. (*In re Marriage of Brinkman* (2003) 111 Cal.App.4th 1281, 1293; *Hall*, at pp. 314–315; *Whealon, supra*, 53 Cal.App.4th at pp. 144–146; *Wilson*, at p. 892; see *Macilwaine*, at pp. 527–528.)

### D. Analysis

The trial court did not make separate factual findings that expressly established the current incomes of Sonia and Asham. Instead, the court adopted the 2023 Dissomaster, which was submitted by Asham in his trial brief and contained monthly income figures. The court also made findings that Asham's parents gave or made available to Asham and Sonia gift income preseparation and continued to give or make available to Asham gift income postseparation. Based on these findings, including a finding under section 4057,

subdivision (b)(6), the court appears to have deviated from the 2023 Dissomaster and made an upward adjustment to reach the $19,310 monthly family support figure. However, as explained below, there are several critical errors in the court's methodology, and these errors require reversal of the FSO.

### 1.        Use of 2023 Dissomaster

As noted above, the 2023 Dissomaster listed Asham's monthly income as $70,000 and Sonia's monthly income as $16,500 and yielded a monthly child support figure of $8,273, a monthly spousal support figure of $6,895, and a total monthly family support figure of $15,168. Although the 2023 Dissomaster was submitted by Asham, we conclude the trial court's adoption of the report and its income figures were error.

### a.        <u>Purpose of the 2023 Dissomaster</u>

Contrary to the trial court's conclusion, the 2023 Dissomaster was not submitted by Asham to be the section 4055 guideline calculation for his on-going monthly family support payments. Asham's closing trial brief contained a section entitled "Support Calculation," which explained that "Attached Exhibit C" was his proposed support calculation. The "Support Calculation" section stated that "Attached Exhibit C" included an unopposed time share calculation and a section 4055 guideline calculation that was based on current purported incomes of $120,000 per year for Asham and $5,276 per month for Sonia (including two deductions for health insurance and retirement). Consistent with this description of "Attached Exhibit C," the closing trial brief at other points described Asham's current income as either $120,000 per year or $10,000 per month. At no point does the closing trial brief anywhere indicate that Asham's current income is anything other than those amounts. Unfortunately, however, "Attached Exhibit C" consisted only of a child custody time share calculation. There was no section 4055 guideline or Dissomaster calculation that was part of exhibit C.

In contrast, the 2023 Dissomaster adopted by the trial court is not part of exhibit C, rather it is part of exhibit D to Asham's closing trial brief. Asham's trial brief had four

24.

attached exhibits, exhibits A, B, C, and D. The closing trial brief, however, never mentions exhibit D. Instead, the closing trial brief describes an exhibit E, which did not actually exist. Under a section entitled "Reimbursement & Retroactivity," which followed the "Support Calculation" section, the closing trial brief states that "Exhibit E" was "a 2022, support calculation based on both parties' reported income." Although the 2023 Dissomaster does not state that it is for the year 2022, the monthly income figures utilized in the 2023 Dissomaster are actually the annual incomes for Asham and Sonia in 2022, as reflected by a table on page 9 of Asham's closing trial brief. Contrary to the closing trial brief's repeated identification of the incomes that Asham believed were appropriate, the 2023 Dissomaster report does not list Asham's income as $10,000 per month or Sonia's income as $5,276 per month.

Considering that Asham's trial brief clearly identified "Attached Exhibit C" as his guideline support calculation, further described exhibit C as performing a guideline calculation based on incomes of $120,000 per year and $5,267 per month, and repeatedly asserted that Asham's income was either $10,000 per month or $120,000 per year, it is apparent that the 2023 Dissomaster of exhibit D was not in actuality "Attached Exhibit C," was not submitted by Asham to set the parties' current respective incomes, and was not meant to set a section 4055 guideline calculation for on-going monthly family support payments. Rather, in context, the 2023 Dissomaster of exhibit D was actually exhibit E and thus was a mislabeled guideline calculation submitted by Asham for the entirety of 2022 in order to determine the appropriate amount of retroactive family support.

### b. 2023 Dissomaster is Not Supported by Substantial Evidence

The 2023 Dissomaster is not supported by substantial evidence because critical components of its calculations are unsupported. Specifically, neither Asham's purported monthly income figure of $70,000 nor Sonia's purported monthly income figure of $16,500 are supported by any evidence, let alone substantial evidence.

With respect to Asham's income, there is no evidence in the record that supports a monthly income figure of $70,000. Apart from the 2023 Dissomaster, the only time a $70,000 income figure can be found is for Asham's entire 2022 *annual* income. Asham testified that he made $70,000 in 2022, and a table in Asham's closing trial brief identified Asham's entire income in 2022 as $70,000. None of the W-2 forms submitted indicate that Asham has ever earned $70,000 per month (or $840,000 per year), and no witness, including Ellis, testified that Asham earned $70,000 per month.[14] Instead, Balbir and Asham both consistently testified that Asham currently was making either $10,000 per month or $120,000 per year by working at the Liquor Lockers, while Sonia testified that Asham earned $100,000 per month based only on what Asham had told her at an unspecified time during their marriage. Therefore, acceptance of the $70,000 *monthly* income figure is either a misuse of Asham's 2022 *annual* income, or a figure that has been plucked from thin air. Either way, the $70,000 monthly income figure is unsupported.[15]

With respect to Sonia's income, a W-2 form from the Chicken Shack indicated that Sonia earned $16,500 for the entirety of 2022. However, no W-2 form or other exhibit showed a monthly income of $16,500. Further, no witness, including Sonia,

[14] Sonia correctly notes that Ellis's marital standard of living analysis demonstrated substantial monthly expenditures and thus substantial monthly income. However, Ellis expressly stated that she never analyzed either Asham's or Sonia's income. Moreover, Ellis's analysis was limited to the time period of January 2020 through November 2021. At the time of the hearing in March 2023, 15 months had elapsed from November 2021. Given this substantial passage of time, anything gleaned from the January 2020 to November 2021 standard of living analysis would not per se relate to the circumstances as they existed at the March 2023 hearing. Finally, Ellis opined that Asham and Sonia spent about $19,500 per month. Even considering that Asham's expenses were unclear, $19,500 per month is a far cry from $70,000 per month.

[15] To be clear, we do not hold that a witness must testify that Asham earned $70,000 per month in order for that finding to be sufficiently supported. Rather, we hold only that there must be some evidence that at least collectively supports a particular monthly income figure. We are unaware of such evidence for the $70,000 figure.

testified that she has ever earned $16,500 per month. Instead, Sonia testified that in November 2022 she was able to obtain employment with the State of California and that her current monthly gross income was $5,518. This figure was supported by an official governmental pay stub. Similar to Asham's income figure, accepting the 2023 Dissomaster's $16,500 *monthly* income figure would be a misuse of her 2022 *annual* income from the Chicken Shack.[16] Therefore, the $16,500 monthly income figure is unsupported.

### 2. Gift Income[17]

Not every type of payment or economic benefit received by a parent may be considered income. (*In re Marriage of Scheppers* (2001) 86 Cal.App.4th 646, 649.) Courts consider the factual context under which monetary gifts or other financial benefits arise to determine whether they should be included or excluded under a parent's income. (*Anna M.*, *supra*, 7 Cal.App.5th at p. 447.) If monetary gifts are sufficiently reoccurring

---

[16] Acceptance of the 2023 Dissomaster's income figure also raises many questions regarding Sonia's needs, earning capacity, and possible intentional underemployment, since it makes little sense for Sonia to leave a job where she earned $16,500 per month in favor of a job that paid her one-third of that amount. (Cf. *In re Marriage of Usher*, *supra*, 6 Cal.App.5th at p. 363 [recognizing that a parent cannot shirk her parental obligations by reducing her earning capacity through unemployment or underemployment].)

[17] The trial court's finding that Asham's parents provided gift income to Asham and Sonia during marriage was made in the alternative. The primary holding was that, because Asham and Sonia had essentially unfettered access to the Business Accounts, the accounts were those of Asham and Sonia. However, there was no evidence that Asham and Sonia actually owned the Business Accounts. To the contrary, Balbir, Asham, and Sonia testified that the Business Accounts belonged to Balbir and Harjit. The fact that Asham and Sonia were given permission to use and access these accounts to regularly pay their living expenses does not legally transform them into their own accounts. The access could be withdrawn at any time and for any reason, and, since the Business Accounts belonged to Balbir and Harjit, the denial of access or withdrawal of permission would not be wrongful. In fact, Sonia acknowledged that she was cut off from the Business Accounts just before separation, which is contrary to the notion that Sonia owned the accounts. Therefore, the finding that the Business Accounts were Asham and Sonia's own accounts is incorrect.

and predictable, then trial courts have the discretion to consider those gifts as income. (*Haley*, *supra*, 76 Cal.App.5th at p. 927; *Alter*, *supra*, 171 Cal.App.4th at p. 736.) However, courts are not required to characterize regular and predictable monetary gifts as income in every case, particularly if the gifts are not fairly available for child support. (*Anna M.*, at pp. 452, 455.)

### a.      Gift Income During Marriage

The trial court properly exercised its discretion to find Asham and Sonia received preseparation gifts through their use of the Business Accounts. Asham, Sonia, and Balbir all expressly acknowledged that, during the marriage, Asham and Sonia paid their monthly living expenses from the Business Accounts. There was no evidence or argument that any living expenses were ever paid by Asham and Sonia from a source other than the Business Accounts, and Ellis's analysis demonstrates that their living expenses substantially exceeded Asham's salary from at least January 2020 through November 2021. We have no difficulty concluding that being given access to and paying all monthly living expenses in excess of Asham's wages from the Business Accounts during what appears to be most, if not all, of Asham and Sonia's 10-year marriage is reasonably characterized as a reoccurring and predictable gift of money. (*Alter*, *supra*, 171 Cal.App.4th at p. 737 [upholding a finding that husband received $6,000 per month in gift income from his mother where he received that amount every month for 10 years].) Therefore, substantial evidence supports the court's finding that Sonia and Asham received gift income from Asham's parents preseparation. (*Id*. at p. 736.)

### b.      Gift Income Postseparation

The trial court did not abuse its discretion by finding that Asham's parents still "subsidized" him and gave him monetary gifts by paying his expenses postseparation from the Business Accounts. Specifically, the evidence shows that Asham was living with his parents, and he testified that many of his expenses, such as car and mortgage payments, were being paid by his parents through the Business Accounts. Balbir and

28.

Asham also testified that she and Harjit continue to "help" Asham postseparation, and neither Asham nor Balbir identified specific limits that were regularly enforced against him with respect to his expenses or access to the Business Accounts (although the limit is intended to be his $10,000 monthly salary). Further, although Asham testified that he now has his own bank account, there was little evidence or documentation concerning the expenses he may have been paying from that account. Finally, even though the precise amount by which Asham's expenses exceeded his salary was not established, Asham acknowledged that his expenses in 2022 and 2023 did in fact exceed his salary. Therefore, substantial evidence supports the finding that Asham continues to be subsidized by and receive monetary gift income from his parents postseparation.

Asham contends that his parents were no longer willing to subsidize or help him. However, the pages cited by Asham do not support this assertion. In the two pages of testimony cited, Balbir was asked both if she was *willing* and if she *wanted* to pay for Asham to get his own housing. She first responded she was willing to do so, but then testified that she did not want to do so, and finally testified that she was not willing to do so. The cited pages are limited only to Asham obtaining a place of his own to live, they do not address any other expenses, and they do not state that Balbir and Harjit will no longer help Asham financially. Moreover, Balbir's answers were ambiguous, and the court could have reasonably concluded that Balbir's first answer, that she was willing to help Asham get his own housing, was the more accurate answer. Balbir admitted she continues to help Asham pay other expenses, and Asham admitted that his parents continue to assist him by paying his monthly expenses if he goes over his $10,000 per month salary/budget. (See *In re Marriage of Dick* (1993) 15 Cal.App.4th 144, 160 [noting that appellate courts accept a trial court's credibility determinations].) Therefore, the pages cited do not undermine the court's finding that Asham continues to be subsidized by his parents postseparation.

29.

Asham also argues that upholding the gift income finding will effectively force his parents to pay family support, or some portion thereof, for as long as the order is in force. Asham is incorrect. Asham's parents owe no legal obligation to pay any portion of a family support order. (*In re Marriage of Williamson* (2014) 226 Cal.App.4th 1303, 1315.) The reason why it is appropriate to recognize some amount of gift income is because the legal criteria for recognizing gift income was met. (Cf. *Haley*, *supra*, 76 Cal.App.5th at p. 927; *Anna M.*, *supra*, 7 Cal.App.5th at p. 447; *Alter*, *supra*, 171 Cal.App.4th at pp. 736–737.) The evidence demonstrated that Asham and Sonia routinely and regularly received gift income through the Business Accounts to pay their living expenses, and Asham continues to routinely receive gift income through the Business Accounts to pay his postseparation living expenses. In fact, we are aware of no evidence in the record that identifies any month in which either Asham and Sonia together or Asham individually postseparation did not receive some amount of gift income beyond Asham's wages in order to pay for living expenses. Nevertheless, the gift income is a function of Balbir and Harjit's culture and generosity. If Balbir and Harjit decide to stop subsidizing him, or to put a strict limit on how much extra money they give him, Asham may present that evidence to the trial court in order to demonstrate changed circumstances. (*Haley*, at p. 929, fn. 2 ["[S]hould the gifts from her father cease for any reason, Antunovich could seek to modify the amount of child support given the change to her income."].) If the court is convinced by such evidence, then the FSO will need to be adjusted to reflect a decrease in Asham's income. (Cf. *ibid.*)

c.      **Amount of Gift Income**

Although we are satisfied the trial court properly determined that Asham and Sonia received gift income during marriage, and that Asham continues to receive gift income postseparation, the court did not make any determinations as to the actual amount of gift income received. During marriage, Ellis's determination of an average of $19,500 in marital expenses being paid would mean Asham's parents gave him and Sonia some

amount up to $19,500 per month on average in gift income between January 2020 and November 2021, in addition to Asham's salary.

After separation, however, there was no analysis done and no evidence that clearly established how much Asham's parents were giving him postseparation in addition to his salary for working at the Liquor Lockers. The testimony of Asham and Balbir shows that a number of Asham's postseparation expenses were paid through the Business Accounts. These expenses appear to exceed Asham's $10,000 monthly salary, but they do not appear to rise to the level of $19,500 per month. That is, the described postseparation expenses do not appear to reach the same levels as the preseparation expenses.

Further, while it may be appropriate to accept that Asham's parents gifted Asham and Sonia preseparation some amount up to $19,500 per month to pay their living expenses, it is not appropriate to accept that this same amount continued to be given to Asham postseparation. (Cf. *In re Marriage of Cheriton*, *supra*, 92 Cal.App.4th at p. 298 [child support orders must reflect a parent's current circumstances at the time of the support order]; *In re Marriage of Sinks*, *supra*, 204 Cal.App.3d at p. 592 [spousal support orders must reflect a spouse's current circumstances at the time of the support order.) At the time of the hearing in March 2023, about 15 months had lapsed from the time of separation, which is a substantial period of time. Asham was living with his parents, and his parents were no longer subsidizing Sonia. Asham's parents had begun to cut off Sonia from access to the Business Accounts sometime between September 2021 and November 2021, and they were no longer willing to pay, nor were they actually paying, any of Sonia's credit card or individual postseparation expenses. This would include no longer paying for things such as cosmetics, beauty salons, luxury items, and any other personal expense which had otherwise been paid preseparation. Also, Balbir testified that she was not pleased with Sonia's spending habits prior to separation and that Sonia's expenditures were causing hardship to herself and Harjit. Consistent with this testimony, there were three instances in 2021 and one instance in January 2022 in which electronic

31.

transfers from the Business Accounts to pay Sonia's Apple credit card were rejected due to insufficient funds. While it appears that a subsequent transfer was successfully made and the corresponding bill was eventually paid for at least the 2021 bills, the fact that insufficient funds existed to make the initial transfer tends to confirm Balbir's testimony that Sonia's spending was causing problems.

Accordingly, we cannot conclude the evidence is sufficiently substantial to show that Asham's parents were subsidizing him postseparation to the same extent or in the same amounts as they were subsidizing Asham and Sonia together preseparation. More evidence and specific findings concerning the postseparation amounts actually expended by Balbir and Harjit beyond Asham's monthly salary, or concerning the postseparation expenses that Asham actually pays on a monthly basis, is needed to support any postseparation gift income figure for Asham. Without such evidence, it is simply too speculative to conclude that Asham's parents regularly and predictably gave him money for his postseparation individual expenses in the same amounts they gave to Asham and Sonia preseparation.

Citing to *Anna M.*, Asham contends in part that the amount of gift income he receives postseparation is not a specific figure and thus cannot be properly classified as gift income. Again, we agree that no amount of monthly gift income was established, but we do not agree that the absence of a constant or specific figure is fatal to the trial court's finding that gift income was received.

The trial court in *Anna M.* exercised its discretion and found that monetary benefits/gifts received by the wife should not be recognized as gift income because the payments had not been received over a lengthy period of years and the gift giver was a legal stranger to the wife. (*Anna M.*, *supra*, 7 Cal.App.5th at p. 445.) In contrasting the regularly monthly payments of $6,000 that the husband in *Alter* received from his mother, the *Anna M.* court explained that it was reasonable for the trial court to have concluded "that gifts from a legal and familial stranger, of less than specific amounts, that

32.

have taken place for an unestablished duration, do not bear enough of a reasonable relationship to the traditional meaning of income as a recurrent monetary benefit to be deemed income" for purposes of child support. (*Anna M.*, at p. 455.) Here, unlike *Anna M.*, the gifts received by Asham are not from familial strangers, they are from his parents. Further, while Asham has been receiving individual monetary gifts to pay his postseparation expenses since December 2021, that is a continuation of his parents' practice preseparation. We are aware of no months during their 10-year marriage in which either Sonia and Asham, or Asham individually postseparation, ever paid living expenses without going over the amount of Asham's salary from working at the Liquor Lockers. Therefore, as in *Alter*, the practice of giving Asham money beyond his salary in order to pay his living expenses is well established.

It appears to be true that no specific and certain sum is or was given by Asham's parents every month. However, *Alter* just happened to involve a constant sum certain, and *Anna M.* simply recognized that the absence of a specific figure was one factor that could be considered in determining whether to recognize regular gift income. Neither *Alter* nor *Anna M.* expressly required that the amount of gift income was to be a constant and specific sum certain. In our case, the variable nature of monthly living expenses (either Asham and Sonia's joint living expenses or Asham's individual expenses postseparation) is what drives the amount of gift income received by Asham. Living expenses naturally fluctuate. Some months will involve unanticipated necessary expenses, some expenses will be incurred but not regularly recurring, and the cost of some regular expenses will naturally increase or decrease. This is why Ellis's analysis utilized average monthly expenditures to reach a monthly standard of living figure. Given the duration and regularity of the monthly gift income that Asham and Sonia received and that Asham continues to receive, by Asham parents, we detect no reason why Asham's gift income cannot be recognized and established by examining the average monthly monetary gift he receives from his parents postseparation, similar to

Ellis's calculation of an average monthly standard of living. Insisting on a specific and certain sum be given every month ignores the fluctuating nature of the gift and would disregard the reality that Asham postseparation, and Asham and Sonia preseparation, expected to receive and relied on the monetary gift in order to pay the monthly living expenses.

In sum, we are left with a supported finding that Asham regularly and predictably receives some gift income from his parents postseparation, but without an adequate finding as to the amount of gift income he receives.[18]

### 3. No Presumptively Valid Section 4055 Guideline Calculation

Each parents' respective income is a very important component of a valid section 4055 guideline calculation. (*Hein*, *supra*, 52 Cal.App.5th at p. 527; *County of Orange v. Smith*, *supra*, 132 Cal.App.4th at p. 1446.) It is also part of the section 4053 policy considerations that underlie child support, which is that each parent is responsible and expected to provide for the support of their children based on the parent's circumstances. (§ 4053, subds. (a)–(d).) As a result, a valid section 4055 guideline calculation depends on the accurate determination of each parent's income. (*Hall*, *supra*, 81 Cal.App.4th at p. 317; see *County of Orange*, at p. 1446.) Without an income figure for each parent that is supported by substantial evidence, an adequately supported and valid section 4055 guideline calculation is not possible. (*Hall*, at p. 317.)

Here, the trial court did not adequately determine Sonia's or Asham's respective current incomes. Although the court found that Asham was currently receiving gift income, no figure was ever established. Further, the court adopted the 2023 Dissomaster

---

[18] Asham contends the trial court improperly considered that his parents were paying his legal fees. If the court had used the amount paid for Asham's legal fees to calculate income or set the amount of family support, the court would have erred. (*County of San Diego v. P.B.* (2020) 55 Cal.App.5th 1058, 1075–1076; *M.S. v. O.S.* (2009) 176 Cal.App.4th 548, 557.) However, the court merely identified the payment of Asham's attorneys' fees as a further example of his parents continuing to support him postseparation. There is nothing improper about this observation.

as its section 4055 guideline figure and, by implication, the 2023 Dissomaster's income figures. However, the 2023 Dissomaster's income figures are not supported by any evidence. Further, as explained above, the 2023 Dissomaster was clearly not submitted by Asham in order to be the section 4055 guideline calculation for his on-going family support obligations. Therefore, the 2023 Dissomaster is a deeply flawed document that does not and cannot function as an adequately supported and presumptively correct section 4055 guideline calculation.

Trial courts must calculate a valid section 4055 guideline in all cases involving child support orders (*Hall*, *supra*, 81 Cal.App.4th at pp. 316–317), even if the court ultimately issues a single family support order. (§ 4074.) While notoriously a complex and arduous task, there is no getting around this requirement. (*Y.R.*, *supra*, 9 Cal.App.5th at p. 983; *Wilson*, *supra*, 87 Cal.App.4th at p. 891; *Hall*, at pp. 316–317; see *Macilwaine*, *supra*, 26 Cal.App.5th at p. 528; *Hubner*, *supra*, 94 Cal.App.4th at p. 183.) Because the court conducted no other section 4055 calculation other than adoption of the 2023 Dissomaster, it never made a valid section 4055 guideline calculation.

### 4. Deviation From a Section 4055 Guideline Calculation

The trial court correctly recognized as a general proposition that it had the discretion through section 4057 to deviate from a presumptively correct section 4055 guideline figure. (§ 4057, subd. (b); *Macilwaine*, *supra*, 26 Cal.App.5th at p. 534; *Hall*, *supra*, 81 Cal.App.4th at p. 317.) However, as a necessary prerequisite to determining whether the considerations of section 4057 warrant a deviation, there must be a presumptively correct section 4055 guideline figure. (*Macilwaine*, at pp. 527–528, 534; *Hubner*, *supra*, 94 Cal.App.4th at p. 184; *Whealon*, *supra*, 53 Cal.App.4th at pp. 144–145; see *Hall*, at p. 318.) Once a section 4055 guideline figure is properly calculated, a trial court is to consider that presumptively correct figure and then consider the propriety of deviating from that figure in light of the considerations enumerated in section 4057, subdivision (b). (*Macilwaine*, at pp. 527–528, 534; *Hubner*, at p. 184; *Whealon*, at

35.

pp. 144–145.) Stated differently, if "the trial court is going to use its discretion to vary the [section 4055] guideline amount, it must make an accurate computation of that amount, then actually use its discretion and state reasons for the variance on the record …." (*Whealon*, at p. 145.) As explained above, the only section 4055 calculation made by the trial court was through its adoption of the invalid 2023 Dissomaster. Because no valid and presumptively correct section 4055 guideline figure was ever calculated in this case, section 4056 was not followed,[19] and the court's deviation was unauthorized. (See *Macilwaine*, at pp. 527–528, 534; *Hubner*, at pp. 184, 189–190; *Hall*, at pp. 318–319; *Whealon*, at pp. 144–145.)

Additionally, the deviation appears to have been based on the trial court's gift income findings or its view of the Business Accounts. However, with respect to gift income, no postseparation (or preseparation, for that matter) gift income figure was ever determined. If an amount of current monthly gift income for Asham had been determined, that figure would have been included in Asham's total monthly income and used to compute a presumably correct section 4055 guideline calculation. (See *Macilwaine*, *supra*, 26 Cal.App.5th at pp. 534–535.) With monthly gift income already included within a valid section 4055 guideline calculation, there would be no basis to deviate from the guideline calculation based on gift income.

With respect to the Business Accounts, there appears to be an assumption that they contain essentially unlimited funds. However, there was no evidence presented regarding how much money was in either of the Business Accounts during any time period. While

---

[19] By its adoption of the 2023 Dissomaster, the trial court was adopting a section 4055 guideline figure of $8,273 per month. Although the trial court invoked section 4057, subdivision (b)(6), the court did not appear to follow section 4056 by explaining the reasons why: (1) the amount of child support ordered differs from the guideline, and (2) is consistent with the best interests of the children. If there is an intent to deviate from a presumptively valid section 4055 guideline calculation, section 4056 requires the court to expressly make these additional findings. (§ 4056, subd. (a); *Macilwaine*, *supra*, 26 Cal.App.5th at p. 536; *Hall*, *supra*, 81 Cal.App.4th at pp. 319–320; *Whealon*, *supra*, 53 Cal.App.4th at p. 144.)

Ellis's standard of living analysis indicates these accounts had sufficient funds to cover on average $19,500 in Sonia's and Asham's combined living expenses from a period of time between January 2020 and November 2021, Ellis did not have any actual values for the Business Accounts, and she offered no opinions as to the current value of those accounts. Further, given the failed initial credit card payments due to insufficient funds, the Business Accounts clearly had fluctuating values that were not always sufficient to pay Asham and Sonia's joint living expenses. In other words, the Business Accounts had natural monetary limits. Also, there is an approximately 15-month gap between the dates of Ellis's analysis and the March 2023 evidentiary hearing. In that time, the evidence demonstrates changed spending patterns from the Business Accounts in that previously authorized expenses were no longer permitted or paid. Thus, the value of the Business Accounts postseparation, and particularly around the time of the hearings and FSO in 2023, is simply unknown.[20] In order for the Business Accounts to be a legitimate basis for a deviation, there must be findings supported by substantial evidence that Asham has the ability to access the amounts contemplated by the court through the Business Accounts and that the Business Accounts regularly and predictably contain the amounts contemplated by the court.[21] As it stands, any implied findings regarding the Business

---

[20]  In this respect, this case is different from *Alter* and *In re Marriage of de Guigne*, both of which were cited and relied on in the FSO. Both *Alter* and *de Guigne* involved either a specific reoccurring monetary gift or a parent's control of assets that were extensive and whose value was well established. (*In re Marriage of de Guigne*, *supra*, 97 Cal.App.4th at p. 1358 [husband earned $240,000 per year but also controlled properties worth millions of dollars]; *Alter*, *supra*, 171 Cal.App.4th at p. 737 [husband received $6,000 per month of gift income from his mother].) Such clarity of value is absent from this case.

[21]  Ellis's analysis indicates that about $19,500 per month was spent from the Business Accounts. There is no evidence, however, of expenditures from the Business Accounts that regularly and significantly exceeded $19,500. Without an understanding of the values of the accounts, simply because a particular level of spending was generally tolerated and able to be paid from the Business Accounts does not mean that any amount of spending would be tolerated or able to be paid from the Business Accounts.

37.

Accounts' current values are speculative at best and do not constitute substantial evidence for purposes of a guideline deviation.

In sum, the deviation imposed by the trial court was legally unauthorized and unsupported by substantial evidence.

### 5. Temporary Spousal Support

Unlike child support orders, trial courts enjoy significant discretion to set the amount of temporary spousal support without the constraint of statutory considerations or mathematical formulations. Courts need only consider the needs of the supported spouse and the ability of the supporting spouse to pay in order to set a spousal support award that attempts to approximate the marital standard of living for both parties. (*Pletcher*, *supra*, 68 Cal.App.5th at p. 912; *Wittgrove*, *supra*, 120 Cal.App.4th at p. 1327.) Here, the failure to accurately set the parties' respective incomes improperly skews Sonia's needs, Asham's ability to pay, and the appropriate amount of support.

The trial court did not make separate express findings regarding Sonia's income. As discussed above, the $16,500 monthly income in the 2023 Dissomaster is wholly unsupported. Although it is likely that Sonia's net monthly income is around $5,000, the court did not appear to consider that income (or any other income) in terms of Sonia's ability to meet her own needs. Indeed, there were no express findings regarding Sonia's needs or the extent she has the ability to meet those needs through her own income.[22]

With respect to Asham, the court's apparent assumption that his parents were giving him gift income postseparation at the same amounts as they were giving both Asham and Sonia for community living expenses is not supported by substantial evidence. In fact, the evidence indicates the opposite. Accepting Asham's and Balbir's assertion that Asham is earning $10,000 per month in wages for working at the two

---

[22] Although we accept an implied finding that Sonia cannot meet all of her needs through her likely $5,000 monthly income, we cannot imply a finding as to the extent to which she is able or unable to meet her needs in light of her monthly salary.

Liquor Lockers,[23] the amount of monetary gift income he currently receives still must be determined. In the absence of a postseparation gift income figure that is supported by substantial evidence, Asham's true income is unknown. And without a sufficiently supported income figure, Asham's ability to pay cannot be adequately known or assessed.[24]

Even if we were to assume that Asham's parents subsidized him postseparation to the same degree that they subsidized Asham and Sonia preseparation, the FSO would be an abuse of discretion. The trial court generally accepted Ellis's expert opinion regarding Asham and Sonia's marital standard of living. Of the approximately $19,500 in monthly preseparation community expenses calculated by Ellis, the amount of monthly family support ordered by the trial court was approximately 99 percent of that figure. Temporary spousal support is intended to ensure that both spouses enjoy their status quo marital lifestyle as closely as possible, subject to the supported spouse's needs and the supporting spouse's ability to pay. (*Pletcher*, *supra*, 68 Cal.App.5th at p. 912; *Wittgrove*, *supra*, 120 Cal.App.4th at p. 1327.) Generally speaking, it will not be possible for both spouses to maintain their preseparation standing of living. (*In re Marriage of Smith*, *supra*, 225 Cal.App.3d at pp. 488–489.) As such, both the supported spouse and the

---

[23] We understand the trial court generally found Asham's testimony to be not credible, and we accept that determination. (*In re Marriage of Dick*, *supra*, 15 Cal.App.4th at p. 160.). However, there does not appear to be a dispute that Asham actually works at the Liquor Lockers or that he actually receives some federally taxable wages for working at these stores (at least as evidenced by the admitted W-2 forms). For purposes of resolving this appeal, we are merely accepting that Asham is currently making $10,000 per month at the Liquor Lockers (in addition to some unknown amount of gift income). On remand, the trial court is free to determine Asham's actual current monthly wages (as well as gift income) at whatever amount is supported by substantial evidence. The court is not bound by our acceptance of the $10,000 figure.

[24] The ability to pay is made up of more than simply income; other monetary obligations should also be considered. (Cf. *Alan S. v. Superior Court* (2009) 172 Cal.App.4th 238, 252–255.) For purposes of the spousal support award, we note only the problematic effects of not setting Asham's income through substantial evidence.

supporting spouse usually will need to make sacrifices and accept a lower (to some degree) postseparation standard of living. (Cf. *ibid.*) Ordering Asham to pay Sonia essentially all of the preseparation expenses allows Sonia to enjoy the full preseparation standard of living, as well as the full value of her own income, while stripping Asham of all his monthly income and drastically lowering his standard of living. The effect is contrary to fashioning a spousal support award that considers Asham's ability to pay and attempts to accommodate both spouses in their accustomed standard of living.

In sum, because Sonia's needs do not appear to have been evaluated in light of her own income, and because there was an insufficient basis to evaluate Asham's ability to pay, the temporary spousal support aspect of the FSO is infirm.[25]

### 6. Conclusion

This was not an easy case, not only with respect to the issues raised, but also with respect to the parties' conduct and submissions before the trial court. We are sympathetic to the court's patience and efforts in attempting to fashion a just and reasonable FSO. Nevertheless, based on the errors identified above, the $19,310 monthly FSO cannot stand. The FSO was fashioned without a proper determination of Asham's and Sonia's respective current incomes, nor was the order fashioned after the calculation of a sufficiently supported and valid section 4055 guideline figure. This led to failures in the application of sections 4055 and 4056, as well as improper considerations regarding Sonia's needs and Asham's ability to pay any support ordered. Because the requirements of sections 4055 and 4056 were not met, and because the trial court relied on insufficiently supported findings, the court abused its discretion by setting the $19,310 monthly family support figure. (*Macilwaine*, *supra*, 26 Cal.App.5th at pp. 527–528, 534; *Hein*, *supra*, 52 Cal.App.5th at p. 529; *Y.R.*, *supra*, 9 Cal.App.5th at p. 983; *In re Marriage of Brinkman*, *supra*, 111 Cal.App.4th at p. 1293; *Wilson*, *supra*, 87 Cal.App.4th

---

[25] For the same reasons discussed within this section, the trial court's alternative section 4320 analysis is flawed and not supported by substantial evidence.

40.

at p. 892; *Hall, supra,* 81 Cal.App.4th at pp. 317–321.) The FSO will be reversed and the matter remanded for the court to make the appropriate findings and calculations.

## III.    RETROACTIVE FAMILY SUPPORT AWARD

The trial court ordered Asham to pay $347,580 in retroactive family support. This figure represents 18 months of family support at $19,310 per month. Because the $19,310 monthly family support award has been reversed, the $347,580 retroactive family support award of necessity must also be reversed.[26]

## IV.    ATTORNEYS' FEES

### A.    *Parties' Arguments*

Asham argues the trial court erred in awarding attorneys' fees to Sonia because the court failed to adequately determine and consider his ability to pay fees. Asham argues the court made no findings regarding his income and did not consider his expenses and mandatory obligations, including the amount ordered as family support, both on-going and retroactive. Instead, Asham contends the court improperly relied on the Business Accounts and the mistaken belief that he has unlimited wealth through access to those accounts. Asham argues the court also did not consider Sonia's income in determining her need for an interim fee award, and did not appreciate that both Asham's and Sonia's parents were paying their respective attorneys' fees. For these reasons, Asham argues that the fee award must be reversed and the matter remanded for further consideration at the time the family support award is recalculated.

Sonia contends that Asham is arguing the attorneys' fees award was a sanction issued under section 271 without notice. Sonia argues this is incorrect and that the award

---

[26]    In his opening brief, Asham argues the trial court did not give him credit for approximately $161,000 in past voluntary support payments. Because we are reversing the FSO, Asham may submit evidence to the court that establishes this $161,000 figure, plus any additional payments he may have made while this matter has been pending before us. Upon review of the evidence, the court will give Asham credit for any prior voluntary support payments that he has made against the amount of retroactive family support ordered.

41.

was properly based on sections 2030 and 2032, which ensure that both spouses have access to legal representation during a dissolution. Sonia argues the court properly found she lacked access to any income or financial accounts postseparation and had to borrow money from relatives to pay her legal fees; whereas, Asham continued to rely on his parents for living expenses and legal fees. Because the fee award was need based, was not punitive, and was supported by substantial evidence, Sonia argues the fee award was appropriate.

### B.      Legal Standards

In order to ensure that both spouses have access to legal representation (*In re Marriage of Seaman & Menjou* (1991) 1 Cal.App.4th 1489, 1496–1497), and based on need, a spouse may obtain an interim order requiring the other spouse to pay for attorneys' fees during a marriage dissolution proceeding. (§§ 2030, subd. (a)(1), 2032; *In re Marriage of Ciprari* (2019) 32 Cal.App.5th 83, 111.) If the trial court's findings demonstrate disparity in access and ability to pay, the court shall make an order awarding attorneys' fees, even if the requesting party has resources to pay for their own legal fees. (See §§ 2030, subd. (a)(2), 2032, subd. (b); *Morton*, *supra*, 27 Cal.App.5th at p. 1051.) However, the Family Code generally provides that "[i]f a court orders a party to pay attorney's fees or costs under this code, the court shall first determine that the party has or is reasonably likely to have the ability to pay." (§ 270.) In the specific context of a dissolution of marriage, section 2030 provides that before a need-based attorneys' fee award is made, the trial court must consider the ability of the payee spouse to pay the attorneys' fees of both parties. (§ 2030, subd. (a)(2); *Ciprari*, at pp. 111–112; *Morton*, at pp. 1049–1050, 1053; *In re Marriage of Keech* (1999) 75 Cal.App.4th 860, 866–868 (*Keech*).) Further, an award of attorneys' fees must be "just and reasonable under the relative circumstances of the respective parties." (§ 2032, subd. (a); *In re Marriage of Hearn* (2023) 94 Cal.App.5th 380, 393–394.) In this regard, courts must take into consideration "the need for the award to enable each party, to the extent practical, to have

sufficient resources to present the party's case adequately," as well as considering the factors listed under section 4320, to the extent those factors may be relevant. (§ 2032, subd. (b).) Through section 4320, a party's earning capacity, standard of living during marriage, assets, obligations, expenses, needs, and ability to pay are all relevant considerations. (§ 4320, subds. (c), (d), (e); *Alan S. v. Superior Court*, *supra*, 172 Cal.App.4th at pp. 252–255.) The amount of fees awarded is limited to the amount that is " 'reasonably necessary' " to maintain or defend a dissolution action. (§ 2030, subd. (a)(1); *Hearn*, at p. 393.) An award of attorneys' fees is reviewed for an abuse of discretion, subject to the limitations imposed by sections 2030 and 2032 (*Morton*, *supra*, 27 Cal.App.5th at pp. 1049–1050; *Keech*, at pp. 866–867), while the findings that support the fee award are reviewed for substantial evidence. (*Hearn*, at p. 394; *Ciprari*, at p. 112.)

### C.    Analysis[27]

Trial courts "must consider the respective incomes and needs of the parties … in exercising its discretion to award attorney's fees." (*In re Marriage of Seaman & Menjou*, *supra*, 1 Cal.App.4th at p. 1497.) As explained above, the trial court did not properly identify and determine Asham's current income (or Sonia's income). It is also unclear what current debts, obligations, and expenses the court determined that Asham had, or how those obligations compared to his income and assets. Without an adequate understanding of the value and relationship of Asham's current income or assets to his current obligations or expenses, the court cannot accurately assess Asham's ability to pay both his and Sonia's attorneys' fees. (§§ 270, 2030, subd. (a)(2), 2032, subd. (b); *A.P. v.*

---

[27]    Contrary to Sonia's arguments, we do not detect a basis for concluding that Asham is making any arguments based on sanctions in general or sanctions under section 271 in particular. Asham's opening brief did not cite to section 271 or use the word "sanction." Instead, Asham's arguments are based on the trial court failing to properly assess his assets, obligations/expenses, and ability to pay Sonia's attorneys' fees. Accordingly, we limit our analysis to those issues.

43.

*K.T.* (2023) 89 Cal.App.5th 988, 1003; *Alan S. v. Superior Court*, *supra*, 172 Cal.App.4th at pp. 252–255; *Keech*, *supra*, 75 Cal.App.4th at pp. 866–867; see § 4320, subds. (c), (e); *Morton*, *supra*, 27 Cal.App.5th at pp. 1052–1053.)

Instead of setting and comparing Asham's income, assets, obligations, and expenses, it appears the trial court simply relied on the fact that Asham continued to have access to and receive some amount of gift income from the Business Accounts. However, the average amount of gift income received from the Business Accounts was never established, nor was the value of the Business Accounts ever established for any timeframe. For the reasons discussed above, and without additional supported findings, it is not reasonable to assume that the Business Accounts contained limitless funds, that Asham could spend limitless funds from the accounts, or that Asham was receiving gift income in the same amounts as he and Sonia had been receiving preseparation. Therefore, simply because Asham continued to have access to and receive an unknown amount of gift income from the Business Accounts does not mean that Asham has the ability to pay either the $80,000 awarded or that he can pay his and Sonia's legal expenses.[28]

Additionally, in terms of the section 4320, subdivisions (c) and (d) consideration of the marital standard of living, the spending discussed by Ellis and Sonia preseparation did not involve $80,000 per month or any amount close to $80,000 per month.[29] The only time that an $80,000 expenditure was discussed was when Balbir provided that amount to Asham and Sonia to start the Chicken Shack as a loan. However, the $80,000 came from Balbir and Harjit's savings account, not the Business Accounts. There is no evidence that Asham has access to his parents' savings account.

---

[28] This is particularly so since Asham's parents, not Asham, were actually paying his legal fees, and the record does not establish which account Balbir and Harjit used to pay those fees.

[29] The spending discussed by Asham and Balbir postseparation also did not indicate that Asham's monthly postseparation expenses approached anywhere near $80,000.

In sum, the record demonstrates that the trial court did not adequately consider the income, assets, debts, and expenses of Asham, and it did not have sufficient information to adequately rely on the Business Accounts as a source for the fee award.  That is, the court did not appropriately follow the requirements of sections 270, 2030, and 2032 or make necessary findings that were supported by substantial evidence.  Therefore, the court's order requiring Asham to pay $79,477 of Sonia's attorneys' fees was an abuse of discretion and must be reversed and the matter remanded for further proceedings.  (*Morton*, *supra*, 27 Cal.App.5th at pp. 1049, 1053–1054; *Alan S. v. Superior Court*, *supra*, 172 Cal.App.4th at pp. 258, 263; *Keech*, *supra*, 75 Cal.App.4th at pp. 866–868, 871; see *A.P. v. K.T.*, *supra*, 89 Cal.App.5th at pp. 1003–1004.)

## DISPOSITION

The trial court's orders on Sonia's motions for family support, retroactive family support, and attorneys' fees are reversed.  This matter is remanded back to the trial court to conduct further proceedings consistent with this order so that Sonia's motions may be appropriately resolved.  Asham is awarded his costs on appeal.

DE SANTOS, J.

WE CONCUR:

DETJEN, Acting P. J.

MEEHAN, J.

45.